WASHINGTON CAPITOLS BASKET-BALL CLUB, INC., a District of Columbia corporation, Plaintiff,

v.

Richard F. BARRY III, also known as Rick Barry; Lemat Corporation, a Delaware corporation and the general partner of a limited partnership doing business under the name of San Francisco Warriors; and San Francisco Warriors, a limited partnership, Defendants.

Civ. No. 52229.

United States District Court
N. D. California.

On Motion to Increase Bond.
Oct. 3, 1969.

On Motion for Preliminary Injunction
Sept. 26, 1969.

Frederick P. Furth, San Francisco, Cal., for plaintiff.

Bancroft, Avery & McAlister, San Francisco, Cal., Loeb & Loeb, Los Angeles, Cal., Morrison, Foerster, Holloway, Clinton & Clark, San Francisco, Cal., for defendants.

## OPINION AND ORDER

LEVIN, District Judge.

This action was commenced by Washington Capitols Basketball Club, Inc., (hereafter "Washington") for declaratory and equitable relief and for damages. The relevant facts which are undisputed are as follows:

On June 19, 1967, Richard F. Barry III (hereafter "Barry") granted to Charles E. "Pat" Boone (hereafter "Boone") and S. D. Davidson (hereafter "Davidson") an option to acquire his services as a professional basketball player for the 1967–68 season, and received an assignment for the transfer of a certain undivided interest in the Oakland franchise of the American Basketball Association (hereafter "ABA"), a Delaware corporation, organized and existing for the purposes, among others, of forming, managing, operating and advising a professional basketball league with member clubs in various cities of the United States.

On the same date Boone executed a guaranty and agreement guaranteeing, among other things, certain earnings to Barry for his services and also agreeing to cause Oakland Basketball, Inc., (hereafter "Oaks") to indemnify and hold Barry harmless from any and all liability Barry may incur by reason of his execution of the option. Such an indemnity agreement was executed on September 29, 1967, by Barry, Boone, Davidson and Oaks.

Pursuant to the option Barry signed an ABA Uniform Player Contract with Oaks, the owner and operator of the ABA franchise for Oakland, California, of a professional basketball team under the name of Oaks. Barry also signed an amendment to the aforesaid ABA contract, dated October 31, 1967, which provides that the term of the employment of Barry by Oaks is for three years commencing on October 2, 1968,

> "or such earlier date as Player's services as a basketball player are not enjoined by order or decree of any court of competent jurisdiction and there is no adjudication by such a court denying Player the right and freedom to contract for his services without restraint or damages by others."

This agreement, as amended, provides "for a salary of $75,000.00 per year plus an amount equal to the lesser of (a) Five (5%) per cent of all gross gate receipts received by the Club per year in excess of the sum of $60,000.00 [1] plus Player's compensation, or (b) $15,000.00." The agreement also provides in paragraph 6 thereof:

> "The Club shall have the right to sell, exchange, assign and transfer this contract to any other professional basketball club in the Association and the Player Agrees to accept such assignment and to faithfully perform and carry out this contract with the same force and effect as if it had been entered into by the Player with the assignee Club instead of with this Club."

On August 28, 1969, Washington and Oaks entered into an agreement of pur-

[1.] This is the figure appearing in paragraph 2 of the Amendment to the ABA Uniform Player Contract dated October 31, 1967. It is noted that the Option executed on June 19, 1967, refers to "$600,000.00" rather than "$60,000.00".

chase which provides, among other things, for the sale by Oaks and the purchase by Washington of all of Oaks:

> "property and assets of every kind and nature whatsoever related to operation of the SELLER'S professional basketball team * * * all of the SELLER'S right and interest in and to contracts with all professional basketball players * * * as well as all other right and interest the SELLER has in and to any and all basketball players whether or not such players are under written contract with the SELLER."

After recitation of the purchase price the agreement contains the statement:

> "The above described purchase price is allocated as follows:
>
> * * * * * *
> "2. $750,000.00 For Rick Barry Contract."

A bill of sale dated September 8, 1969, from Oaks to Washington was executed by the president and secretary of Oaks and an assignment from Oaks to Washington as of the same date was similarly executed. On August 29, 1969, Barry entered into a contract to play professional basketball with defendant San Francisco Warriors (hereafter "Warriors"), a limited partnership, organized and existing under the laws of the State of California, the owner of a professional basketball team franchise of the National Basketball Association (hereafter "NBA") for a term of five years commencing October 2, 1969, and terminating October 1, 1974. Defendant Lemat Corporation (hereafter "Lemat"), a Delaware corporation qualified to do business in the State of California, is the sole general partner of the aforesaid limited partnership.

At this stage of the proceedings plaintiff seeks a preliminary injunction to enjoin Barry from playing professional basketball with any team other than plaintiff "for so long as Barry remains in default under his contract with plaintiff."

■ The grant or refusal of injunctive relief is a matter of equitable jurisdiction. 43 C.J.S. Injunctions § 12, p. 419. A Court of Equity will grant the relief when it determines it essential to restrain an act contrary to equity and good conscience. 43 C.J.S. Injunctions § 1, p. 405.

## I.

■ The purpose of the preliminary injunction is to maintain the status quo between the litigants pending final determination of the case. Hamilton Watch Co. v. Benrus Watch Co., 206 F. 2d 738, 742 (2d Cir. 1953). In order for plaintiff to succeed in its motion for a preliminary injunction, it is fundamental that it show at least first, a reasonable probability of success in the main action and second, that irreparable damage would result from a denial of the motion. Speedry Products, Inc. v. Dri Mark Products, Inc., 271 F.2d 646, 648 (2d Cir. 1959).

### A. *The Status Quo*

The status quo is the last, peaceable, uncontested status between the parties which preceded the present controversy. Tanner Motor Livery, Ltd. v. Avis, Inc., 316 F.2d 804, 809 (9th Cir. 1963) cert. den. 375 U.S. 821, 84 S.Ct. 59, 11 L.Ed. 2d 55 (1963); see generally 43 C.J.S. Injunctions § 19, pp. 432, 434.

■ The parties have differed in their interpretation of the meaning of the status quo in this case. It seems exceedingly clear that the status quo of the parties to the action was that peaceable state of affairs existing when Barry was under contract to Oaks and, prior to his injury, playing professional basketball for that team during the 1968–69 season. Although it is manifest that Barry cannot now play basketball for Oaks, their assets having been sold to Washington, the assignment of Barry's contract to Washington makes his obligations to them the closest to the status quo that can be attained. Most assuredly, permitting Barry to play with War-

riors, which Barry indicated he would do if the preliminary injunction were not granted, would not be preserving any semblance of the situation as it existed just prior to the commencement of the present litigation.

### B. *Probability of Success at Trial*

■ It is uncertain whether plaintiff will prevail at the trial on the merits; however, it is clear that plaintiff need not prove its case with absolute certainty prior to the trial in order to succeed in its motion for a preliminary injunction. The issuance of a temporary injunction was affirmed on appeal in the *Hamilton Watch* case, *supra* 206 F.2d at 740, wherein the Court noted that "* * it will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation." Moreover, "[T]he burden [of showing probable success] is less where the balance of hardships tips decidedly toward the party requesting the temporary relief." Checker Motors Corporation v. Chrysler Corporation, 405 F.2d 319, 323 (2d Cir. 1969), cert. den., 394 U.S. 999, 89 S.Ct. 1595, 22 L.Ed.2d 777 (1969), citing Dino De Laurentiis Cinematografica, S. p. A. v. D–150, Inc., 366 F.2d 373, 374–375 (2d Cir. 1966).

■ Defendants have not shown that the contract between Oaks and Barry, which was assigned by Oaks to Washington, is itself unconscionable, unenforcible or otherwise void. It is under this contract that Washington seeks to assert its rights to Barry's services and the protection of this Court from violation of those rights. The precedents for granting injunctive relief against "star" athletes "jumping" their contracts—and certainly defendants do not deny that Barry is a unique, a "star" athlete—are numerous. Houston Oilers, Inc. v. Neely, 361 F.2d 36 (9th Cir. 1966), cert. den. 385 U.S. 840, 87 S.Ct. 92, 17 L.Ed. 2d 74, reh. den., 385 U.S. 942, 87 S.Ct. 285, 17 L.Ed.2d 74 (1966); Winnipeg

Rugby Football Club v. Freeman, 140 F. Supp. 365 (N.D.Ohio 1955); Dallas Cowboys Football Club, Inc. v. Harris, 348 S.W.2d 37 (Civ.App.Tex.1961); Central New York Basketball, Inc. v. Barnett, 181 N.E.2d 506 (Ohio Com.Pl. 1961); American League Baseball Club of N. Y. v. Pasquel, 187 Misc. 230, 63 N.Y.S.2d 537 (Sup.Ct.1946).

### C. *Showing of Irreparable Injury*

Plaintiff must also make a showing of irreparable injury in order to be awarded injunctive relief. Although Rule 65 of the Federal Rules of Civil Procedure does not by its terms so state, it is well settled in equity jurisprudence that such a showing of injury must be made in order to support the granting of a preliminary injunction. Barron and Holtzoff, Federal Practice and Procedure § 1433, p. 490.

■ Irreparable injury is that which cannot be compensated by the award of money damages; it is injury which is certain and great. Federal Maritime Com'n v. Atlantic & Gulf/Panama Can. Zone, 241 F.Supp. 766, 781 (9th Cir. 1965). Such injury exists when an athletic team is denied the services of an irreplaceable athlete. Barry is just such an irreplaceable athlete. He was the leading collegiate basketball scorer in the United States during the 1964–65 season and was voted Rookie of the Year during his first season of professional basketball in 1965–66 while playing with the Warriors. He was the leading scorer in the NBA during the 1966–67 season and was voted Most Valuable Player in the 1967 National Association All Star Basketball Game. Finally, while playing for Oaks during the 1968–69 season, he was the team's and ABA's leading scorer until an injury forced him to cease play. It is apparent today that with such a surfeit of fine basketball players in the United States graduating annually from collegiate ranks, the mere signing of a player to a professional basketball contract is substantial evidence of his outstanding qualities. When, like Barry, a

player has proven his superior ability under the rigorous conditions of professional basketball, it is clear that money alone cannot replace his loss.

## II.

Defendants contend that even if the above requirements are satisfied by Washington, there are a number of reasons referred to hereafter which preclude the granting of such relief in this case. The reasons are considered along with the major arguments of defendants.

### A. *The Contract between the Oaks and Barry Was Not Breached by Oaks*

#### 1. *The Contract was Assignable*

■ Although defendants dispute the validity of the assignment of Oaks' franchise and the contract with Barry to Washington, Barry's contract with Oaks clearly provided for such assignment,[2] and it is not otherwise contrary to public policy or the law of this State. The language of the contract is clear and unambiguous. See Farmland Irrigation Co. v. Dopplmaier, 48 Cal.2d 208, 222, 308 P.2d 732, 66 A.L.R.2d 596 (1957).

In the opinion of the Court, Barry's contract with Oaks was an integrated agreement which included the ABA Uniform Player Contract as amended, the Option, the Assignment, the Guaranty and Agreement, and the Indemnity Agreement.[3] Even if the contract between Barry and Oaks is determined to be the sole document governing the contractual relationship of the parties, the same result ensues, for there is no doubt about the assignability of the agreement of the parties embodied therein.

#### 2. *Barry Remains Obligated to Perform under the Contract*

■ Defendants next contend that Barry does not remain obligated to per-

form for Washington under the assignment because Oaks' actions constituted a breach of its contract with Barry. That contract provides that Barry shall receive compensation in the following form for a three year period: 1) a salary of $75,000.00 per year, plus 2) the lesser of 5% of all gross gate receipts received by the Oaks in excess of the sum of $60,000.00[4] or $15,000.00 plus 3) an ownership interest in the Oakland franchise to consist of 15% of the shares to be issued thereon (upon payment of $5,000.00 by Barry), plus 4) a guaranty of indemnity by the Oaks for any expenses incurred by Barry in making a legal defense of his agreement with the Oaks.

Defendants claim that the assignment of Barry's contract from Oaks to Washington diluted the value of Barry's 5% "gate interest", because the only available arenas in which Washington would play basketball have capacities of 6500–7000 persons, while the arena in which the Oaks had played had a capacity of approximately 12,000. In answer to this, it need only be pointed out that despite the capacity of its playing arena the Oaks drew an average attendance of only 1800 persons per game during the 1968–69 season, a number that may be accommodated easily in the available Washington arenas.

Defendants also claim that Barry's 15% ownership interest has been rendered null by the assignment of his contract with Oaks. If Barry's interest has been rendered nugatory, it is because of Oaks' disastrous financial condition and not because of its assignment to Washington.[5] After all, as a shareholder Barry still was entitled to realize his proportionate share of any amount Oaks realized upon the sale of its assets to Washington. In any event, what would Barry's ownership interest be worth

2. ABA Uniform Player Contract, see Para. 6 quoted *supra.*

3. See facts *supra.*

4. See footnote 1 *supra.*

5. Oaks was nearly $2 million in debt at the time of the sale of its assets to Washington (see Affidavit of George M. Olson).

even if the prayed-for preliminary injunction were *not* granted? Oaks' financial condition raises serious doubts about Barry's ability to sell his ownership interest for any profit, even were a buyer available. No matter what the outcome of this case at trial, Oaks cease to exist. Therefore, it is illogical for Barry to argue that the denial of an injunction against him will in any way increase the value of his ownership interest in Oaks. In fact, Earl Foreman, the owner of Washington, has offered to purchase Barry's ownership interest in the defunct Oaks in order that Barry play with Washington.[6]

### B. Plaintiff Is Entitled to Equitable Relief Because It Comes to a Court of Equity with Clean Hands

 It is a settled and ancient maxim that, "He who comes into equity must come with clean hands." Precision Instrument Mfg. Co. v. Automotive Maintenance Machinery Co., 324 U.S. 806, 814, 65 S.Ct. 993, 997, 89 L.Ed. 1381, reh. den., 325 U.S. 893, 65 S.Ct. 1189, 89 L.Ed. 2005, pet. den. 325 U.S. 843, 65 S. Ct. 1561, 89 L.Ed. 1967 (1944); New York Football Giants, Inc., v. Los Angeles Charger Football Club, Inc., 291 F.2d 471 (5th Cir. 1961); 30 C.J.S. Equity § 93, p. 1006; 27 Am.Jur.2d § 136, p. 666; 4 A.L.R. 44. In determining this point the Court examined the principle enunciated by courts that if plaintiff's hands are not clean equity must deny him relief no matter how improper defendant's conduct may have been. *Precision Instrument, supra,* 324 U.S. at page 814, 65 S.Ct. 993. Consequently, Barry's conduct in breaching his original contract with Warriors and executing the contract with Oaks has not been given weight in considering the question of injunctive relief. Certainly it is not every instance or allegation of misconduct that will leave plaintiff's hands soiled, and it is wholly within the discretion of the Court to find plaintiff's claim for relief barred by his own alleged misconduct. *Precision Instrument, supra,* at page

815, 65 S.Ct. 993; Dymo Industries, Inc., v. Tapeprinter, Inc., 326 F.2d 141, 143 (9th Cir. 1964).

 Defendants seek to invoke the doctrine of clean hands to bar injunctive relief in favor of Washington on the basis that since Washington's predecessor in interest, Oaks, was guilty of misconduct at an earlier time, Washington must be tainted similarly by imputation. The inducement by Oaks of Barry to contract with Oaks in 1967 while he still had a year to play under his contract "option" year with Warriors was the particular misconduct ascribed to Oaks. In Lemat Corp. v. Barry, 275 A.C.A. 732, 80 Cal.Rptr. 240 (1969), an injunction was granted Warriors to prevent Barry from playing under his subsequently signed contract with Oaks. The Court of Appeal affirmed the finding of the trial court that Oaks had induced Barry to breach his contract with Warriors.

Even if such conduct by Oaks would be sufficient to invoke the defense of unclean hands were Oaks a party to this suit, it is inapplicable to defeat the claim of Washington, for the two reasons discussed hereafter.

### 1. Oak's Unclean Hands, If Any, Do Not Taint Plaintiff

 In order for defendants to invoke successfully the doctrine of clean hands, they must show that it is the *plaintiff in this action,* Washington, who is tainted. This defendants have failed to do and they have not cited any persuasive authorities to support their view that Washington, the successor, is tainted in equity by the malfeasance of Oaks, its predecessor.

In Art Metal Works v. Abraham & Straus, 70 F.2d 641 (2d Cir. 1934) the issue before the Court was whether the tortious acts of a servant would be imputed to his master who was without knowledge thereof. The Court answered this in the affirmative, but Judge Learned Hand delivered a dissent there-

---

6. Affidavit of Richard F. Barry III.

to, the logic of which has been relied upon by many courts. Judge Learned Hand said (at page 646):

"Whenever the question has come up, it has been held that immoral conduct to be relevant, *must touch and taint the plaintiff personally;* that the acts of his agents, though imputed to him legally, do not impugn his conscience vicariously. Vulcan Detinning Co. v. American Can Co., 72 N.J.Eq. 387, 391, 392, 67 A. 339, 12 L.R.A.(N.S.) 102; * * *. On principle, so far as there is any principle about the whole matter, it seems to me that a plaintiff should not be so charged. The doctrine is confessedly derived from the unwillingness of a court, originally and still nominally one of conscience, to give its peculiar relief to a suitor who in the very controversy has so conducted himself as to shock the moral sensibilities of the judge. It has nothing to do with the rights and liabilities of the parties; * * *. While it stands upon the court's repugnance to the suitor personally, it must confine itself to his personal delinquencies." (Emphasis added.)

The relationship of Oaks and Washington is not that of master and servant but the more remote one of seller-assignor and purchaser-assignee, giving us even more cause to heed Judge Learned Hand's erudite opinion.

In Universal Builders, Inc., v. Moon Motor Lodge, Inc., 430 Pa. 550, 244 A.2d 10, 13 (Pa.1968), the Court dismissed the contention of Moon, a property owner, that Universal should be denied relief on a construction contract Universal was seeking to enforce. Moon claimed that Universal had unclean hands because, during the performance of the subject contract, an officer and executive of Universal allegedly manufactured evidence to support Universal's case. In refusing to find Universal tainted by implication, the Court cited the dissent

of Judge Learned Hand and said that "the attribution of one party's unclean hands to another party is not based on simple agency principles." The Court refused to apply the doctrine of clean hands where the "wooden" result would be inequitable. *Universal, supra,* 244 A.2d at page 14.

In General Motors Acceptance Corporation v. Gilbert, 196 Cal.App.2d 732, 17 Cal.Rptr. 35 (1961), the assignee of an automobile conditional sales contract sued to quiet title. The defense was that the finance company was guilty of unclean hands in that it took the assignment knowing that its predecessor had secured the contract by false pretenses and in violation of California Civil Code § 2984. The Court held (at page 741, 17 Cal.Rptr. at page 41):

"The contention that G.M.A.C. went into the trial court with unclean hands is untenable. The court found to the contrary. The assignment to G.M.A.C. transferred all of the right of Martin under the conditional sale contract to G.M.A.C. (Civ.Code, § 1459.) The latter did not go into the trial court with unclean hands merely because it knew at the time it paid the purchase price for the assignment that Desmond had obtained the automobile by false pretenses."

No reason is presented to this Court why the instant case poses a situation where justice requires that equitable relief be denied to plaintiff. On the contrary, the very exercise of the conscience and discretion of the Court demands that plaintiff be able to make its arrangements free of any alleged taint of its predecessor.[7]

**2.** *The Misconduct Alleged, If Any, Is Not Referable to the Transaction Which Is The Subject of This Suit*

■ The maxim of clean hands will not be invoked unless the inequitable conduct sought to be attributed to plaintiff is referable to the very transaction

**7.** Peoples v. Ault, 128 Md. 401, 97 A. 711, 712 (1916); Cuba Colony Co. v. Kirby, 149 Mich. 453, 112 N.W. 1133, 1135

(1907); Slocum v. Slocum, 37 Misc.Rep. 143, 74 N.Y.S. 447, 449 (1902); 30 C.J.S. Equity § 96, p. 1030.

which is the source of the instant controversy. Hoehn v. Crews, 144 F.2d 665 (10th Cir. 1944) aff'd Garber v. Crews, 324 U.S. 200, 65 S.Ct. 600, 89 L.Ed. 870 (1945); McCullough Tool Company v. Well Surveys, Inc., 395 F.2d 230, 238 (10th Cir. 1968) cert. den. 393 U.S. 925, 89 S.Ct. 257, 21 L.Ed.2d 261 (1968); 27 Am.Jur.2d § 142, p. 679. In the leading United States Supreme Court case of *Precision Instrument, supra,* Mr. Justice Murphy in the opinion of the Court said (at page 814, 65 S.Ct. at page 997):

> "Thus while 'equity does not demand that its suitors shall have led blameless lives,' Loughran v. Loughran, 292 U.S. 216, 229, [54 S.Ct. 684, 689, 78 L.Ed. 1219], as to other matters, it does require that they shall have acted fairly and without fraud or deceit *as to the controversy in issue,* [citing cases]." (Emphasis added.)

In Fibreboard Paper Prod. Corp. v. East Bay Union of Machinists, 227 Cal.App.2d 675, 39 Cal.Rptr. 64 (1964), defendants were picketing as a result of an alleged breach by plaintiff of a collective bargaining agreement with them. In the action by plaintiff seeking to enjoin the picketing and other tortious conduct by defendants, defendants alleged the unclean hands of plaintiff as a defense. The allegation arose from the contention of defendants that plaintiff had breached its contract with defendants or, in the alternative, had been guilty of fraudulent misrepresentation.

The Court found that because plaintiff sought to enjoin the tortious conduct of defendants, the "transaction" in controversy before the Court did not include the possible breach of the agreement by plaintiff, even though the possible breach may have indirectly affected the matter before the Court. The Court summarized at pages 728–729, 39 Cal. Rptr. at page 97:

> "The misconduct which brings the clean hands doctrine into operation *must relate directly* to the transaction concerning which the complaint is

made, i. e., it must pertain to the *very subject matter involved* and affect the equitable relations between the litigants. Accordingly, *relief is not denied because the plaintiff may have acted improperly in the past or because such prior misconduct may indirectly affect the problem before the court* (citing cases)". (Emphasis added.)

In the instant case the "transaction" which is the subject matter of the suit is the offer by Warriors to Barry of a contract which provides that Barry play basketball for Warriors while Barry still was under contract to play basketball for Oaks. Any misconduct for which Oaks is responsible by reason of its entering into a contract with Barry while he still was under his original contract with Warriors is, at most, a case of misconduct which is remote or misconduct which affects the instant case only indirectly.

Furthermore, it must be noted that Oaks' contract, under which Barry played for a season and received sizable compensation, did not go into effect by its own terms until after Barry's original contract with Warriors ended. In any event, Warriors were able to obtain redress for Oaks' alleged earlier misconduct through the issuance of an injunction enjoining Barry from playing for any other team until September 30, 1968, which in effect prevented Barry from playing with Oaks in 1967–68. (See Lemat Corp. v. Barry, *supra.*) Thus Warriors incur no continuing harm as a result of Oaks' earlier actions, and the Court believes that it would be inequitable and untenable to impute to Washington the prior, redressed wrongful action of Oaks in inducing the breach of contract between Warriors and Barry.

Minnesota Muskies, Inc. v. Hudson, 294 F.Supp. 979 (M.D.N.C.1969) relied upon by defendants is distinguishable. In that case, Lou Hudson, a professional basketball player, negotiated and signed a contract to play with the Minnesota Muskies of the ABA while still subject

to an "option" year under his then-existing contract with the St. Louis Hawks of the NBA. Hudson signed a three-year contract with Minnesota but before playing a game for that team he became discontented and he was able to procure a new five-year contract from the Hawks. In an action by Minnesota and its assignee, Florida Professional Sports, Inc., to enjoin Hudson from playing for anyone except Minnesota, defendants raised the defense of plaintiffs' unclean hands. The Court agreed, finding plaintiffs' hands too soiled to award them relief, and so denied injunctive relief.

Unlike the instant case, Minnesota, the original party which induced Hudson's breach of contract, was a plaintiff in the action for an injunction, and thus sought to benefit by its own wrongdoing. Furthermore, Minnesota's assignee intended that Hudson begin to play for it while he was still under contract to the Hawks by reason of an option agreement. In addition, there seemed little doubt that the Hawks would exercise the option. The Hawks had received no other redress for the wrong done to it when Minnesota encouraged Hudson to breach his contract with the Hawks. Finally, Hudson had not received any benefits under the Minnesota contract, a factor which distinguishes it from the instant case. Barry realized substantial benefits even during the year 1967–68 when he did not play for Oaks as well as in the year 1968–69 when he did play for Oaks.

### III.

The other arguments of the defendants are illusory. Barry claims that an undesirable situation would be created if he were forced to play for a party with whom he is now in litigation and with whose arrangements he is dissatisfied. The simple answer is that in granting a preliminary injunction this Court is not forcing Barry to play for Washington. He is free to "sit it out" if he so desires, the course of action which Barry took in 1967–68.

Barry alludes to his goodly personal and financial interests in the San Francisco Bay Area, all of which he claims would be jeopardized by a move to the Washington, D. C. area. Again, the answer is that Barry need do nothing, if he so desires, while this preliminary injunction is in effect. Every famous athlete may suffer some damage to his local business and personal interests or other inconvenience when the assignment of his contract requires him to relocate in another city; but nothing is more commonplace in the history of organized professional sports in America than such moves, through trades and otherwise. Even were Barry to go to Washington, we see nothing preventing him from developing similar business interests and opportunities flowing from his unique basketball skills, if he desires to utilize them.

 No matter which side prevails on the merits in this controversy, it is indisputable that the other side may suffer substantial harm. This element of relative harm is one of the matters that this Court has considered in reaching its decision. "In determining whether to grant a preliminary injunction it is proper for a court to 'weigh the equities' (Willpat Productions, Inc., v. Sigma III Corporation, 227 F.Supp. 354, 356 (S.D. N.Y.1964)) and 'balance the hardships.'" Clairol Incorporated v. Gillette Company, 270 F.Supp. 371, 381 (E.D.N.Y.1967), aff'd 389 F.2d 264 (2d Cir. 1968).

### IV.

Although the consequences of this determination may result in the departure of Barry from the San Francisco Bay Area to his claimed detriment, equitable considerations constrain this Court to sign this day the proposed findings of fact, conclusions of law, and order granting to plaintiff a preliminary injunction.

Any relief granted herein is without prejudice to defendant Barry's right to seek damages for any loss he may suffer and prove legally during the existence of this preliminary injunction.

## DEFENDANTS' MOTION TO INCREASE AMOUNT OF BOND AS SECURITY FOR ISSUANCE OF PRELIMINARY INJUNCTION

This Court ordered on September 26, 1969, that plaintiff post a bond in the amount of $100,000 as security for the issuance of a preliminary injunction in its favor, pursuant to the requirements of Rule 65(c), F.R.Civ.P. Defendants now move that the amount of the bond be increased, although no new or changed circumstances have occurred since the amount was set for the original bond.

The main purpose of the injunction bond is to safeguard defendants from costs and damages incurred as the result of a preliminary injunction improvidently issued. Defendants make differing estimates as to the amount of damage they may suffer by the allegedly wrongful granting of this preliminary injunction, but the Court finds all of such arguments to be without merit.

Defendant Lemat Corporation, the sole general partner of the San Francisco Warriors, claims it may lose as much as $356,000 as a result of Rick Barry's not playing basketball for it in the coming season. This projected loss is, at best, highly speculative, and it is unsupported by any factual showing. Even if we accepted, *arguendo*, the figure of $356,000 as the loss in gross gate receipts attributable to the absence of Rick Barry, this is clearly not the amount Lemat Corporation will be damaged thereby for purposes of computing the amount of the injunction bond.

This figure fails to take into account (1) operating expenses and (2) the salary of $167,500 to be paid by Lemat Corporation to Rick Barry for the first year of the contract between him and Lemat Corporation. Lemat Corporation also fails to consider the increased revenues likely to be derived from the attendance of fans who formerly attended the games of the Oakland Oaks but who, because of the transfer of that franchise to Washington Caps, can no longer watch the Oaks play.

Defendant Rick Barry argues that, as to him, the damage to be suffered by the alleged improvident issue of the preliminary injunction would be at least the amount of the salary ($167,500) offered him by the San Francisco Warriors for the first year of their contract. But this estimate is not the measure of the possible damage to be suffered by Barry either, because it neglects to take into account the salary of $75,000 and other income benefits to accrue to Barry under his contract with the Washington Caps. The Court is informed that Barry already has received a salary payment from the Washington Caps.

Rule 65(c), F.R.Civ.P. provides for the posting of a security bond, "[I]n such sum as the court deems proper * * *." It is clear that the amount of the security is left largely to the discretion of the court. Detroit Trust Co. v. Campbell River Timber Co., 98 F.2d 389, 393 (9th Cir. 1938). This Court finds the amount of the original bond, $100,000, to be more than adequate to cover any possible damage to defendants resulting from the allegedly improper issuance of the preliminary injunction, and therefore to be proper.

Accordingly, defendants' motion for an increase in the amount of the bond is denied.