**WASHINGTON CAPITOLS BASKET-BALL CLUB, INC., a District of Columbia corporation, Appellee,**

v.

**Richard F. BARRY, III, also known as Rick Barry; Lemat Corporation, a Delaware corporation and the general partner of a limited partnership doing business under the name of San Francisco Warriors; and San Francisco Warriors, a limited partnership, Appellants.**

No. 24921.

United States Court of Appeals
Ninth Circuit.

Nov. 28, 1969.

Robert M. Ruben (argued) and Robert A. Holtzman, of Loeb & Loeb, Los Angeles, Cal., Morrison, Foerster, Holloway, Clinton & Clark, San Francisco, Cal., for appellants.

Frederick P. Furth (argued), San Francisco, Cal., for appellee.

Before HAMLEY, MERRILL and TRASK, Circuit Judges.

TRASK, Circuit Judge:

This is an appeal from an order of The United States District Court for the Northern District of California which granted a preliminary injunction to the

plaintiff, Washington Capitols Basketball Club, Inc., (1) enjoining the defendant, Richard F. (Rick) Barry III from playing basketball for any professional team other than the Washington "Caps" and (2) enjoining the San Francisco Warriors and Lemat Corporation[1] from attempting to enforce a five year playing contract signed on August 26, 1969 between Rick Barry and the Warriors.

Barry and the Warriors appeal to this court pursuant to 28 U.S.C. § 1292. Jurisdiction is based upon diversity of citizenship. 28 U.S.C. § 1332.

The basic controversy is whether Rick Barry will play professional basketball pending final determination of this action as a member of the Washington "Caps" of the American Basketball Association or the San Francisco Warriors of the National Basketball Association. The District Court on Sept. 26, 1969, on the basis of the facts and the law then presented, ruled in favor of the Washington "Caps". 304 F.Supp. 1193. We affirm.

All parties agree that the playing ability of Rick Barry on a basketball court is such that he is a legally "unique" party to a player's contract. After an outstanding collegiate career at The University of Miami, he signed and played with the Warriors during the 1965–66 basketball season and was named the league's "Rookie of the Year". On August 29, 1966, he signed a second contract with the Warriors for one year beginning October 1, 1966 and executed a National Basketball Association Uniform Player Contract containing a "reserve" or "option clause".[2] Such a clause gives the club the right to contract with the player for an additional year. This option was exercised on or about June 22, 1967 by the Warriors for the playing year 1967–1968.

In the meantime, on June 19, 1967, Barry signed an option agreement with Pat Boone and Kenneth Davidson giving the optionees or their assigns the right on or before October 2, 1967, to contract with him for three years beginning 1967–1968, or if he were to be enjoined, to begin at a later date and in the meantime reserved the right to play with the Warriors. On October 31, 1967, Barry signed the contract in question here with Oakland Basketball, Inc. a corporation, to play for Oakland for three years commencing on October 2, 1968.

This contract likewise contained a reserve clause for an additional year. In addition to his salary, Barry also received an annual bonus plus a 15% stock interest in the corporation which owned the Oakland franchise.

The dispute resulting from Barry's action in signing the allegedly conflicting contracts caused the Warriors to file suit against him to determine their con-

1. Lemat Corporation is the sole general partner of the San Francisco Warriors, a limited partnership. The two entities will be referred to hereafter as "San Francisco Warriors" or "Warriors".

2. This "option clause" reads as follows: "24. On or before September first next following the last playing season covered by this contract and renewals and extensions thereof, the Club may tender to the Player a contract for the next succeeding season by mailing the same to the Player at his address shown below, or if one is not shown, then at his address last known to the Club. If the Player fails, neglects, or omits to sign and return such contract to the Club so that the Club receives it on or before October first next succeeding, then this contract would be deemed renewed and extended for the period of one year upon the same terms and conditions in all respects as are provided herein, except that the compensation payable to the Player would be the same provided in the contract tendered to the Player pursuant to the provisions hereof, which compensation would in no event be less than 75% of the compensation payable to the Player for the last playing season covered by this contract and renewals and extensions thereof.

The Club's right to renew this contract, as herein provided, and the promise of the Player not to play otherwise than for the Club and its assignees, have been taken into consideration in determining the amount of compensation payable under paragraph two hereof."

tract rights under their 1966 contract. They asserted claims for both damages and equitable relief by way of injunction. The Court of Appeal of California determined that the Warriors were entitled to enjoin Barry from playing for anyone else until September 30, 1968. The Court further held that the Warriors were not entitled to injunctive relief beyond that date and that they could not recover damages from Barry in addition to the equitable relief granted. Lemat Corporation v. Barry, Cal.App., 80 Cal.Rptr. 240 (1969). That decision settled all issues as between the Warriors and Barry arising out of the August 29, 1966 contract. Neither the Oakland Club nor its franchise owners were parties to that litigation. Barry did not play during the 1967–1968 playing season. However, he played for Oakland during the 1968–1969 season pursuant to the terms of the contract with Oakland signed on October 31, 1967. No question was apparently raised by the Warriors against either Barry or the Oaks as to the legality of this performance under the contract.

On August 28, 1969, the Oaks, having lost substantial sums of money during their two years' existence, entered into an agreement of sale with the Washington Capitols Basketball Club, Inc. in which Washington contracted to purchase all property and assets of the Oaks including the contracts of basketball players under contract to the Oaks. A specific amount of the purchase price was allocated to the contract between Oakland and Barry which was being assigned. Subsequently a Bill of Sale was executed by Oakland transferring the assets to Washington.

Although his Oakland contract would remain in effect until October 1, 1971, upon the day following the Oakland-Washington purchase agreement, Barry entered into a new contract to play professional basketball with the San Francisco Warriors for a term of five years beginning October 2, 1969 and ending October 1, 1974.

Promptly upon learning of Barry's contract with the Warriors, the plaintiff, Washington Capitols Basketball Club, Inc., brought this action against Barry, Lemat Corporation and the Warriors. The action sought to enjoin Barry from playing basketball with any club other than the Caps during the remainder of the term of the contract which Washington had acquired. It further sought to enjoin the Warriors from asserting any contract with Barry or interfering with the performance of the Caps contract. It also sought damages both compensatory and punitive. A temporary restraining order was issued on September 15, 1969, the date the action was filed.

A hearing was held on September 23, 1969 on the application for a preliminary injunction. The Honorable Gerald S. Levin issued an opinion and judgment on September 26, 1969, granting the injunction against both Barry and the Warriors pending final determination. Barry and the Warriors appeal from that order. The court required a bond in the sum of $100,000 from the plaintiff to secure the payment of all costs and damages and that bond was filed on September 29, 1969. Because of the urgency involved, this court agreed to expedite the appeal and heard the matter on oral argument on October 28, 1969.

■ The grant of an order for a preliminary injunction is not a final determination of the case. It evidences the exercise of the discretion of the trial court to maintain the status quo between the litigants until final judgment may be rendered. Hamilton Watch Co. v. Benrus Watch Co., 206 F.2d 738 (2 Cir. 1953).

"The decision to grant or to refuse a preliminary injunction lies within the District Court's sound exercise of its discretion. In an appeal from the grant of a preliminary injunction, the question before this court is, did the District Court abuse its discretion in granting a preliminary injunction?" Ross Whitney Corp. v. Smith Kline &

French Labs., 207 F.2d 190, 194 (9th Cir. 1953).

■ On an appeal from such an order it is the responsibility of this court to decide only the question as to whether or not the grant of the order was an abuse of discretion. An abuse of discretion has been defined as "a plain error, discretion exercised to an end not justified by the evidence, a judgment that is clearly against the logic and effect of the facts as are found." Bowles v. Quon, 154 F.2d 72, 73 (9th Cir. 1946). We consider that the District Court did not abuse its discretion and that pending a decision on the merits the order granting a preliminary injunction should stand. The discussion which follows, however, and any conclusions drawn therefrom should be read as preliminary and "are not to be construed as foreclosing any findings and conclusions to the contrary based upon evidence which may be received at the trial on the merits." Ross Whitney Corp. v. Smith Kline & French Labs., 207 F.2d 190, 199 (9th Cir. 1953).

## THE STATUS QUO

The function of a preliminary injunction is to maintain the *status quo ante litem* pending a determination of the action on the merits. The status quo is the last, uncontested status preceding the commencement of the controversy. Tanner Motor Livery, Ltd. v. Avis, Inc., 316 F.2d 804, 808–809 (9th Cir. 1963), cert. denied, 375 U.S. 821, 84 S.Ct. 59, 11 L.Ed.2d 55 (1963). It is therefore necessary to examine what constituted the last, uncontested status of the parties.

The plaintiff, Washington Caps, purchased the Oakland Oaks by agreement dated August 28, 1969. The action by Washington against the Warriors was commenced September 15, 1969. The status quo on these dates appears to have been as follows:

1. All rights under the Warriors' contract with Barry, dated August 29, 1966, had been litigated and the judgment of the court had been performed. Lemat Corporation v. Barry, *supra*. Neither Barry nor the Warriors had further rights or obligations under it due each other after September 30, 1968.

2. The Oakland contract, which Washington acquired and upon which this action was brought, was signed October 31, 1967 for Barry to play for three years beginning October 2, 1968 with an option for one year more.

3. Barry had played one year—the playing season of 1968–1969—under his contract with Oakland—without legal interruption. This contract, by its terms, was to commence October 2, 1968 and to continue until 1972.

4. Washington had acquired the Oakland franchise, assets and player contracts on August 28, 1969.

5. Barry signed a contract with the Warriors on August 29, 1969 for five years commencing August 2, 1969 and had announced his intention to play with the Warriors during the 69–70 season.

Thus, at this point in time there were no continuing obligations by Barry to play for Warriors under the 1966 contract. Barry had played for Oakland during 1968–1969 or during the first year of the three year term of the 1967 Oakland contract with the remainder of the term having been assigned to Washington; and the Warriors and Barry had signed a contract on the day following the Washington sale, for Barry to play for Warriors for five years for a greatly increased salary, beginning in 1969 and in direct conflict with the remainder of the Washington contract period. This action was begun on September 15, 1969 or prior to the date of the beginning of the 1969–1970 playing season.

■ We hold that, under these facts, the preliminary injunction served to maintain the *status quo ante litem*.

## ALLEGED ILLEGALITY

The legality of the Oakland contract which is under attack by the Warriors must be determined by the substantive law of California, the place of making of the contract. Erie R. Co. v. Tompkins, 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); Hutchinson v. Hutchinson, 48 Cal.App.2d 12, 119 P.2d 214, 217 (1941).

As no illegality of the contract is disclosed by plaintiff's complaint or the contract itself, illegality is an affirmative defense and defendants-appellants have the burden of pleading and proof. Eaton v. Brooks, 124 Cal.App.2d 10, 268 P.2d 58, 60 (1954).

The District Court did find that "[d]efendants have not shown that the contract between Oaks and Barry, which was assigned by Oaks to Washington, is itself unconscionable, unenforcible or otherwise void." 304 F.Supp. at 1197. We agree with this finding. Appellants have not cited to us, nor have we found, any constitutional provision or civil or criminal statute which this contract violates. Nor do we think the contract is contrary to public policy. Appellants rely upon the Restatement of Contracts, § 576, which reads: "A bargain, the making or performance of which involves breach of a contract of a third person is illegal." The comment to this Restatement section, however, reveals that the section is inapplicable to the facts of this case. The comment states: "a. Since breach of contract is a legal wrong, a bargain *that requires for its performance* breach of a contract with another is opposed to public policy." (Emphasis supplied.) Barry's performance under his Oakland contract to begin October 2, 1968, did not require breach of his Warrior contract which expired September 30, 1968. The Warrior contract, entered into on August 29, 1966, had a duration of one year beginning October 1, 1966. On or before September 1, 1967, the Warriors had a right to tender to Barry a contract for the 1967–1968 season. They exercised this right and, as Barry failed to sign and return the proffered contract by October 1, the contract was "deemed renewed and extended for the period of one year." Barry was not obligated to perform for the Warriors during that year but was obligated, by the original contract, to refrain from playing for any other team until the contract terminated on September 30, 1968. This interpretation of the contract has been upheld in Lemat Corp. v. Barry, *supra,* 80 Cal.Rptr. 240 (1969).

Barry signed his contract with Oakland while still under contract to the Warriors, who claim that this act was a breach of Barry's contract to them. The Oakland contract, however, was a contract for future services "for a term of three (3) years commencing on October 2, 1968, or such earlier date as [Barry's] services as a basketball player are not enjoined." Performance and consideration therefor were to begin only upon the termination of the Warrior contract.

Neither Barry's signing nor Oakland's inducement of him to sign was an illegal act rendering the Oakland contract illegal. Associate Justice Hufstedler of the California Court of Appeal, now Judge Hufstedler of this Court, stated in Diodes, Inc. v. Franzen, 260 Cal.App.2d 244, 67 Cal.Rptr. 19, 25–26 (1968):

> "Even though the relationship between an employer and his employee is an advantageous one, no actionable wrong is committed by a competitor who solicits his competitor's employees or who hires away one or more of his competitor's employees who are not under contract, so long as the inducement to leave is not accompanied by unlawful action."

*See also,* Sarkes Tarzian, Inc. v. Audio Devices, Inc., 166 F.Supp. 250, 264 (S.D.Cal.1958), aff'd, 283 F.2d 695 (2 Cir. 1960), cert. denied, 365 U.S. 869, 81 S.Ct. 903, 5 L.Ed.2d 859 (1961). In each of these cases, the hired-away employee was not under contract to his employer. Barry was under contract to the Warriors at the time he signed with Oakland but his performance under the

Oakland contract was not to begin until after his obligations to the Warriors ceased on October 1, 1968. This fact distinguishes cases in which courts have found an actionable wrong where an employee was encouraged to terminate his contract prior to its termination date. *See, e. g.,* Buxbom v. Smith, 23 Cal.2d 535, 145 P.2d 305 (1944).

As Judge Learned Hand said a long time ago:

"Nobody has ever thought, so far as we can find, that in the absence of some monopolistic purpose every one had not the right to offer better terms to another's employé so long as the latter is free to leave." Triangle Film Corp. v. Artcraft Pictures Corp., 250 F. 981, 982 (2d Cir. 1918).

■■ The language of the Oakland contract and amendment thereto dated October 31, 1967 indicate that the drafters were aware of Barry's contractual obligations to the Warriors. It may be presumed that they drafted the Oakland contract with the intent of making it legal and binding. Calif.Code Civ.Proc. § 1963, Subds. 1, 33; Sweeney v. KANS, Inc., 247 Cal.App.2d 475, 55 Cal.Rptr. 673, 676 (1966). Parties to a contract are deemed to have intended a lawful rather than an unlawful act. Duntley v. Tutt, 48 Cal.App.2d 367, 119 P.2d 804, 806 (1941).

■ We believe the trial court was correct on the record before it in ruling that this contract was not illegal under general contract principles and neither was it violative of the provisions of the Sherman Anti-Trust Act. 15 U.S.C. § 1. See Dallas Cowboys Football Club, Inc. v. Harris, 348 S.W.2d 37, 47 (Tex.Civ. App.1961).

## UNCLEAN HANDS

Appellant's unclean hands argument arises because Boone and Davidson persuaded Barry to give them an option to play for the 1967–1968 season during which Barry was already under contract with the Warriors. But the playing contract which Washington seeks to enforce is not a contract with Oakland Basketball, Inc., a corporation. It was for playing rights for the period after the Warriors' rights had terminated. There is thus the very serious question whether any inequity exists in the performance of this contract even as against the Oakland corporation. When carried one step beyond to the Washington corporation, the attempted attainder is even more remote.

To add to the doubt surrounding the validity of applying the clean hands doctrine against Washington it must be remembered that both Warriors and Barry have had their day in court in this alleged wrongdoing. Lemat Corp. v. Barry, *supra.* The issues have been resolved and the judgment performed.

■ The application or rejection of the clean hands doctrine in a given case is equitable in nature and within the discretion of the trial court. Johnson v. Yellow Cab Transit Co., 321 U.S. 383, 64 S.Ct. 622, 88 L.Ed. 814 (1943); Houston Oilers, Inc. v. Neely, 361 F.2d 36 (10th Cir. 1966); cert. denied, 385 U.S. 840, 87 S.Ct. 92, 17 L.Ed.2d 74 (1966); Precision Instrument Mfg. Co. v. Automotive Maintenance Mach. Co., 324 U.S. 806, 65 S.Ct. 993, 89 L.Ed. 1381 (1945).

Moreover, the bad conduct must pertain to the subject matter involved and affect the equitable relations between the litigants.

As was said in. Fibreboard Paper Prod. Corp. v. East Bay Union, 227 Cal. App.2d 675, 39 Cal.Rptr. 64, 97 (1964).

"[I]t is not every wrongful act nor even every fraud which prevents a suitor in equity from obtaining relief. The misconduct which brings the clean hands doctrine into operation must relate directly to the transaction concerning which the complaint is made, i. e., it must pertain to the very subject matter involved and affect the equitable relations between the litigants. Accordingly, relief is not denied because the plaintiff may have acted improperly in the past or because such prior misconduct may indi-

rectly affect the problem before the court. (Bradley Co. v. Bradley, 165 Cal. 237, 242, 131 P. 750; Germo Mfg. Co. of Missouri v. McClellan, 107 Cal. App. 532, 541–543, 290 P. 534; Carman v. Athearn, 77 Cal.App.2d 585, 598, 175 P.2d 926; Treager v. Friedman, 79 Cal.App.2d 151, 173, 179 P.2d 387; Sheppard v. Wilcox, 210 Cal. App.2d 53, 61–62, 26 Cal.Rptr. 412.) As was said in Moriarty v. Carlson, *supra* 184 Cal.App.2d 51, 7 Cal.Rptr. 282: 'The misconduct must infect the cause of action before the court. * * * A party may have relief in connection with a transaction itself untainted although his original title may have been tainted by improper conduct. * * *' (184 Cal.App.2d p. 57, 7 Cal.Rptr. p. 285.)."

The contract which Washington seeks to enforce is one which the Warriors assert was negotiated while Barry's 1966 Warriors contract was still uncompleted. Washington did not participate in this activity. Neither did the Oakland Club as an entity. It was Boone and Davidson who later organized the Oakland corporation. The contract when finally completed on October 31, 1967 was after the option held by Boone and Davidson had expired according to its terms. It was also for performance at a date to commence after the date (October 2, 1968) upon which the California Court of Appeal decided the Warriors contract terminated, i. e., September 30, 1968.

■ With respect to the attempted invocation of the clean hands doctrine by Barry against Washington, it is interesting to note the lack of consistency in the Barry position. For the purpose of entering into a contract with Oakland for more money than he was then getting from the Warriors, his attorney wrote the Oakland president on October 29, 1968 saying:

"Since Rick became free to play for Oakland commencing October 1, 1968 * * *"

In this action, brought for the purpose of restraining Barry from jumping back to the Warriors for still more money, he asserts as against Washington, Oakland's transferee, that he was *not* free to play for Oakland commencing October 1, 1968, and thus Washington is possessed of unclean hands. Any misconduct arising out of an interference with the 1966 Warriors contract is remote, as the trial court points out, and affects the present litigation only indirectly. The hands of this appellee are not unclean. The rights between Barry and Warriors under the old contract have been litigated and performed. The rights as between Warriors and Boone and Davidson for damages are being litigated in another jurisdiction.

What we have said here disposes of questions with respect to the assignment of the contract from Oakland to Washington. The entire history of this sorry series of events indicates that irreparable injury is involved and equitable jurisdiction justified.

■ Finally, appellant argues that the oral representations alleged to have been made by Boone and Davidson about keeping the franchise in Oakland constitute a breach of the contract and are a bar to relief. The express terms of the contract are to the contrary and must take precedence over alleged prior oral agreements. See Cal.Civ.Code § 1698. Moreover, we have difficulty being persuaded that a professional athlete who has signed as many conflicting contracts as Barry, is naive enough to believe (1) that he takes no risk of being traded or sold, or (2) that the franchise might not be transferred or (3) that the embryonic club for which he was playing incurred no risk of becoming a financial failure.

The record here supports the action taken by the trial court and it is affirmed.