**WEST COAST CONSTRUCTION COMPANY, Inc., Plaintiff,**

v.

**OCEANO SANITARY DISTRICT et al., Defendants.**

**Civ. No. 70–127.**

United States District Court,
N. D. California.
April 8, 1970.

Gerald C. Weaver, Crossman, Weaver & Geihs, Pismo Beach, Cal., E. D. Bronson, Jr., Charles Preuss, Bronson, Bronson & McKinnon, San Francisco, Cal., for plaintiff.

Gerald W. Shipsey, Shipsey & Seitz, San Luis Obispo, Cal., for defendants.

GERALD S. LEVIN, District Judge.

### I. *Statement of Facts*

This action arises from a contract dispute between plaintiff West Coast Construction Company ["West Coast"] and defendant Oceano Sanitary District ["District"]. On July 7, 1967, West Coast and the District entered into a written agreement whereby West Coast agreed to construct for the District a sanitary sewer collection system within the boundaries of the District. The District was then and is now located in the town of Oceano, in the county of San Luis Obispo, in California.

In order to finance the construction of said system, the District issued general obligation bonds in the amount of $400,-000.00 and revenue bonds in the amount of $150,000.00, all of which were purchased by the Farmers Home Administration ["FHA"]. Pursuant to its contract with the District, West Coast was to be paid on a unit-price basis by monthly progress payments, with the District to retain each month 10% of the value of the material provided and work done during the preceding progress period as security for fulfillment of the contract.

West Coast commenced construction, and from July 7, 1967, through November 2, 1967, received payment in the amount of $246,492.68, while the District retained for work performed during this period the amount of $27,388.08.

On November 2, 1967, West Coast ceased performance of the work under its agreement with the District, and ad-

vised the District at that time that it would not proceed with the the work unless it received immediate payment of claimed delinquent progress payments in the amount of $139,008.17. On February 1, 1968, West Coast filed a formal claim with the District in the amount of $244,540.63, which figure included the retention monies on work previously performed.

Subsequently, on February 5, 1968, at the request of the District and the FHA, West Coast submitted a lump-sum bid in the amount of $213,000.00 as a bid to complete the sewer system on the following conditions:

(1) The District raise sufficient funds through additional bond sales and/or grants, to pay West Coast items 1, 2, 3, 4, 9, and 11 of its claim;

(2) The District pay to West Coast 70% of item 12 of West Coast's claim;

(3) The District deposit in escrow the remaining 30% of item 12 of West Coast's claim, to be held as security to guarantee West Coast a net profit of 12% on the entire project;

(4) The District pay to West Coast the $27,388.08 in retention monies for work performed by West Coast prior to November 2, 1967; and

(5) The District pay to West Coast $213,000.00 for completion of the work.

Thereafter the District received a commitment from the FHA whereby the FHA agreed to purchase an additional authorized, but as yet unsold, District revenue bonds in the amount of $50,-000.00 and to grant to the District the amount of $180,000.00 in grant funds pursuant to authority under 7 U.S.C. § 1926. These monies, together with the amounts realized earlier from the original general obligation bond and revenue bond issues, gave the District sufficient construction funds to complete the sewage system project and to provide for the above-mentioned escrow deposit.

After receipt of this commitment from the FHA, West Coast and the District entered into an agreement on March 28, 1968, entitled, "An Agreement of Release, Compromise and Settlement." Under this Settlement Agreement, the District paid to West Coast the amount of $131,072.88 and deposited in escrow the amount of $42,949.65. Thereafter West Coast completed the sewer system project in accordance with the Settlement Agreement and has received for its work payment in the amount of $319,-859.48.

The District presently has a balance in said grant funds of $55,512.73, and West Coast alleges that there is a balance due it on the contract price, in the amount of $61,196.00, of which $48,-688.08 is retention monies held by the District as security for fulfillment of the contract by West Coast.

West Coast has brought suit against the District in a California state court in order to recover the amounts allegedly due it. By the present action in this court, West Coast seeks to restrain the District from diverting some $18,000.00 of the $55,512.73 remaining in its grant funds balance to the use of attorneys' fees and litigaton expenses attendant upon its defense of the state court suit. West Coast contends that such diversion is not a permissible use of the funds advanced to the District by the FHA, and that should the diversion occur, West Coast will have a significantly smaller fund against which to recover should it prevail in its state court suit.

## II. *Standing of West Coast to Maintain Action*

█ Before turning to the substance of the parties' contentions, we are met at the outset with a procedural problem, namely whether West Coast has standing to maintain this action. The District contends that West Coast does not have the requisite standing to challenge the grant of federal funds made here, and that on this ground alone West Coast's application for a preliminary injunction must be denied. Although the question

is not free from doubt, we are of the opinion that West Coast does have standing to request the relief it seeks.

The District bases its contentions on three cases, none of which is dispositive of the present case. In Alabama Power Co. v. Ickes, 302 U.S. 464, 478–479, 58 S.Ct. 300, 82 L.Ed. 374 (1938), the Supreme Court found the plaintiffs to lack standing because the "injury" complained of was merely lawful competition. The same reasoning was the basis for a similar holding in California Water Service Co. v. City of Redding, 22 F.Supp. 641, 644 (N.D.Cal.1938), aff'd per curiam, 304 U.S. 252, 58 S.Ct. 865, 82 L.Ed. 1323 (1938), where the trial court found that one who was the owner of a business lacked standing to challenge the receipt of federal monies by a municipality where the only "injury" complained of was possible ruin because of lawful municipal competition.[1] The final case cited by the District, Trauss v. City of Philadelphia, 159 F.Supp. 672, 676 (E.D.Pa.1958), rested a dismissal partly on the plaintiff taxpayer's failure to exhaust his state remedies and partly on his insufficient interest *as a taxpayer* pursuant to the holdings in the *Ickes* case, *supra*, and Massachusetts v. Mellon, 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078 (1923).

In the present case, however, plaintiff is neither "merely" a competitor nor "merely" a taxpayer. West Coast is a creditor of the District, and as such has a sufficient and adverse interest in seeing that the District has adequate funds available to meet its obligations should the state court litigation in which the parties are now involved result in a money judgment for West Coast.

This result is consonant with both good sense and the liberalized view of standing recently articulated by the Supreme Court. In Flast v. Cohen, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968), the Supreme Court undertook to "reexamine" its earlier pronouncements on the issue of an individual taxpayer's standing to challenge a federal appropriation. In rejecting its earlier and more stringent view of taxpayer standing, the Supreme Court reiterated that (392 U.S. at 99, 88 S.Ct. at 1952),

> The "gist of the question of standing" is whether the party seeking relief has "alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions." Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed. 2d 663 (1962).

Although some courts have read *Flast* narrowly, restricting its scope to cases where, like *Flast*, a First Amendment Establishment Clause question raised by a taxpayer would be at issue,[2] other courts and the commentators have realistically viewed *Flast* as heralding a more pragmatic and equitable approach to the always-elusive concept of standing.[3] That this liberal reading of *Flast* was intended seems clear in light of another, more recent Supreme Court case, Association of Data Processing Service v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L. Ed.2d 184 (March 3, 1970). The Court

---

1. It should be noted that even the "mere competitor" rule has undergone revision in recent years. While it is generally true that a competitor as such lacks standing to complain of a party's lack of legal authority to engage in its business, several exceptions to this rule have sprung up, as where the competition is "illegal," or where there is an injury to a legal right, or where there is a statutory aid to standing. See Arnold Tours, Inc. v. Camp, 408 F.2d 1147, 1149, 1150 (1st Cir. 1969).

2. Lind v. Staats, 289 F.Supp. 182, 185–186 (N.D.Cal.1968); Benson v. City of Minneapolis, 286 F.Supp. 614, 619 (D. Minn.1968).

3. E. g., Citizens Association of Georgetown v. Simonson, 403 F.2d 175, 176 (D.C.Cir. 1968), cert. den. 3259 M Street, Inc. v. Citizens Ass'n of Georgetown, 394 U.S. 975, 89 S.Ct. 1454, 22 L.Ed.2d 755 (1969); Raoul Berger, "Standing to Sue in Public Actions: Is it a Constitutional Requirement?" 78 Yale L.J. 816, 817–818 (1969).

there noted that, "[w]here statutes are concerned, the trend is toward enlargement of the class of people who may protest administrative action."

### III. There is No Sound Legal Basis for the Relief Requested

Moving on to the substance of the present action, we find that West Coast's motion for a preliminary injunction rests upon the interpretation given 7 U.S.C. § 1926, the statute which authorized the FHA grant in question. 7 U.S.C. § 1926, relating to water and waste facility loans and grants, permits grants to projects such as that involved in this action and in order to finance "development costs," such being defined to include:

[T]he cost of construction of a facility and the land, easements, and rights-of-way, and water rights necessary to the construction and operation of the facility.

West Coast argues that "development costs" is not, and was not meant to include expenses incurred in litigation involving a sanitation district receiving funds thereunder. The District argues, to the contrary, that any reasonable interpretation of the governing statute *does* envision the use of grant funds for other than construction purposes—such as expert consultation and necessary legal services. To support its position, the District points to an interpretive or "in-house" bulletin of the FHA, the Farmers Home Administration Instruction 442.1, which bulletin clearly contemplates the use of grant funds for purposes other than just construction.[4] The relevant portions of that bulletin read as follows:

8 DEVELOPMENT COST. The term 'development cost' means the cost of construction of the proposed facility, including land rights, easements, rights-of-way, necessary water rights, engineering fees, *legal fees*, administrative costs in connection with construction and acquisition, and estimated interest

during the development period on any funds borrowed to perform such development.

\* \* \* \* \* \*

"V USE OF LOAN AND GRANT FUNDS: Funds may be used in accordance with the following:

A *Loan and Development Grant Funds*. Loan Funds may be used for all of the following purposes. Development grant funds may be used only for the following purposes which represent a part of the development cost, except interest:

1 DOMESTIC WATER AND WASTE DISPOSAL FACILITIES. Install and improve central community domestic water and waste disposal facilities including:

\* \* \* \* \* \*

b Sanitary sewer facilities including collection lines, treatment plants, outfall lines, disposal fields, and stabilization ponds. (Revised 1–16–69–PN 136).

\* \* \* \* \* \*

5 SERVICES AND FEES. Pay costs incidental to establishment of such facilities or for services necessary in accomplishing any of the above purposes, including, *but not limited to:*

\* \* \* \* \* \*

b Paying for other services necessary in obtaining the loan or grant, and in planning and *completing the facilities to be financed.*" [Italics added.]

\* \* \* \* \* \*

The statute in question here, 7 U.S.C. § 1926, is a pristine enactment which has as yet been subjected neither to judicial scrutiny nor critical comment. Moreover, what little legislative history there is on the matter sheds no light on the issue raised in the present action. In this situation, we must rely heavily on a practical and reasonable construction of the statute as well as on any materials which would prove helpful.

---

4. The cited portions of the Farmers Home Administration Instruction are before the court as incorporated into the Affidavit of Joseph Haspray, the Acting Administrator of the FHA.

One such material which is available is the FHA Instruction just cited. Although the Instruction does not deal with the precise question at issue here, its clear thrust is to countenance a broad use of federal grant monies in order to complete sanitation and sewer systems undertaken with the help of such monies. Certainly legitimate legal expenses may be considered a cost necessary to "completing the facilities to be financed." To conclude that 7 U.S.C. § 1926 does not contemplate the use of federal grant monies for other than construction purposes would mean that such incidental but vital functions as the procuring of expert engineering advice and accounting services would not be deemed a requirement necessary "for completing the facilities to be financed," a result for which we can find no support in the statute or in logic.

Indeed, we do not understand West Coast to contend that the FHA Instruction does not cover the expenditure in question here, but rather that the Instruction, not being published in any available public source, is to be accorded no respect in this case.

Courts have consistently looked to administrative construction of ambiguous statutes as made by agencies charged with their administration in determining questions arising under such statutes. Depending on the consistency, duration, and source of such administrative constructions, the courts have declared that such pronouncements are entitled to "the highest respect," [5] "great respect," [6] "controlling weight," [7] "great weight," [8] "some weight," [9] "great deference," [10] or "due deference." [11] This deference emanates from the fact that the agency entrusted with the administration of a statute can contribute to the court's understanding that agency's body of experience and informed judgment as expressed in its rulings, interpretations, and opinions. See Skidmore v. Swift & Co., 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944). An oft-quoted rule to this effect appears in McLaren v. Fleischer, 256 U.S. 477, 481, 41 S.Ct. 577, 578, 65 L.Ed. 1052 (1921):

> It therefore comes within the rule that the practical construction given to an act of Congress, fairly susceptible of different constructions, by those charged with the duty of executing it is entitled to great respect and, if acted upon for a number of years will not be disturbed except for cogent reasons. [Footnote omitted.]

■ Although the FHA Instruction need not be accorded the deference owing to an administrative rule which has been challenged and has been in force and acted upon for some years, it is nonetheless true that the administrative interpretation endorsed by the FHA Instruction is entitled to *some* weight. In the absence of any contrary indication, and on the basis of the reasoned approach to planning under 7 U.S.C. § 1926 as ex-

5. 2 Am.Jur.2d Administrative Law § 241, at 66–67.

6. McLaren v. Fleischer, 256 U.S. 477, 481, 41 S.Ct. 577, 65 L.Ed. 1052 (1921); Cornman v. United States, 409 F.2d 230, 233 (Ct.Cl.1969); Assiniboine & Sioux Tribes v. Nordwick, 378 F.2d 426, 432 (9th Cir. 1967).

7. Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 413–414, 65 S.Ct. 1215, 89 L.Ed. 1700 (1945); Indiana Broadcasting Corporation (WANE–TV) v. F.C.C., 407 F.2d 681, 691 nn. 80, 81 (D.C.Cir.1968).

8. Leary v. United States, 395 U.S. 6, 25, 89 S.Ct. 1532, 23 L.Ed.2d 57 (1969); United States v. Amer. Trucking Ass'ns., 310 U.S. 534, 549, 60 S.Ct. 1059, 84 L.Ed.2d 1345 (1940); Local 189, United Papermak. & Paperwork. v. United States, 416 F.2d 980, 997 (5th Cir. 1969).

9. Lassiter v. Guy F. Atkinson Co., 176 F.2d 984, 992 (9th Cir. 1949). *But cf.* Securities and Exchange Comm'n v. Sterling Precision Corp., 393 F.2d 214, 220 (2d Cir. 1968) ("Uncontested administrative construction of this nature carries relatively little weight." [Citations omitted.]).

10. Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965).

11. Williams v. Dandridge, 297 F.Supp. 450, 460 (D.Md.1968).

pressed in the FHA Instruction, we are inclined to follow it and recognize, at least at this stage of the proceedings, the District's rights to pay for necessary and reasonable legal expenses out of its grant funds.

 Even were we not as convinced of the rectitude of the position taken by the FHA Instruction and the District, we would reach the same conclusion insofar as the request for equitable relief is addressed to the equity conscience of the court. Requisite to the granting of the extraordinary remedy of injunctive relief, the moving party must satisfy the court of the existence of several factors in its favor. See Coffee Dan's Inc. v. Coffee Don's Charcoal Broiler, 305 F. Supp. 1210 (N.D.Cal.1969).

One of these factors is irreparable injury, defined as that injury which is certain and great. Federal Maritime Comm'n v. Atlantic & Gulf/Panama Can. Zone, 241 F.Supp. 766, 781 (S.D.N.Y.1965). In the present case, any injury to be suffered by West Coast is rendered uncertain not only because West Coast may not prevail in its substantive contract action in the state courts, but also because, contrary to West Coast's contention, the District *could* raise additional monies, if it had to do so, by increasing its tax rate to the local citizens.[12]

A second factor is the requirement of a convincing showing of probable success on the merits of the action. Dymo Industries, Inc. v. Tapeprinter, Inc., 326 F.2d 141, 143 (9th Cir. 1964). Far from making such a showing, it appears that West Coast may well *not* prevail on the merits at such time as this case is tried.

Finally, it should be remembered that the request for a preliminary injunction is a discretionary remedy and one directing the court's attention to the relative hardships to be suffered by each of the parties, as well as by the public. In view of this, we are of the opinion that West Coast has failed to satisfy us of the elements requisite to the granting of the relief it seeks, and that therefore its motion for a preliminary injunction must be denied.

It is so ordered.

12. It is admitted that the District is empowered to levy a general tax of up to $1.00 per $100.00 of assessed valuation, while at present it is levying a general tax of $.25 per $100.00 of assessed valuation. Concededly, the District Board of Directors could be forced into increasing the tax rate in order to meet the District's financial obligations. Understandably, however, the District does not desire to raise the tax rate unless and until it is in fact forced to do so.