**CITY OF GRAND RAPIDS, a Municipal Corporation, Plaintiff,**

v.

**Elliott L. RICHARDSON, Secretary of Commerce, and John W. Eden, Assistant Secretary of Commerce for Economic Development, United States of America, Defendants.**

**No. G 77–1 CA 1.**

United States District Court,
W. D. Michigan,
S. D.

Jan. 24, 1977.

As Corrected Jan. 26, 1977.

See also, D.C., 429 F.Supp. 1096.

John H. Logie, Warner, Norcross & Judd, Grand Rapids, Mich., for plaintiff.

John H. Bauckham, Kalamazoo, Mich., for intervening defendant.

Robert S. Fastov, Dept. of Commerce, Washington, D.C., Frank S. Spies, U. S. Atty., Grand Rapids, Mich., for defendants.

## Opinion

MILES, District Judge.

This suit arises out of the administration of Title I (the Local Public Works Capital Development and Investment Act of 1976, 42 U.S.C.A. §§ 6701–6710 (Supp. 4, 1976)) of the Public Works Employment Act of 1976, 42 U.S.C.A. § 6701 *et seq.* (Supp. 4, 1976), Pub.L. No. 94–369, 90 Stat. 999. This legislation establishes a program of federal grants primarily for the construction, renovation, repair, or other improvement of local public works projects. *See* 42 U.S. C.A. § 6702. It authorized an appropriation of $2 billion ($2,000,000,000)[1] for these purposes (42 U.S.C.A. § 6710), to be allocated to projects according to a stated scheme. Seventy percent (70%) of this sum was to be directed to projects from areas with unemployment rates (for the three most recent consecutive months) *in excess of* the national unemployment rate; and the remaining thirty percent (30%) was reserved for projects from areas with unemployment rates *equal to or less than* the national unemployment rate.[2] 42 U.S.C.A. § 6707(c), (d). Plaintiff, the City of Grand Rapids, commenced this action challenging the Economic Development Administration's (EDA) treatment of plaintiff's grant applications under the above Act. The Court (Chief Judge Fox) issued a temporary restraining order prohibiting the defendants "from distributing any funds [under this Act] . . . to any of the cities or governmental agencies in the State of Michigan whose names are appearing in the so-called 30% area as published in the Federal Register Volume 41 No. 248 for Thursday, December 23, 1976, p. 56158." After a ten day extension,

---

1. This amount was subsequently appropriated by Title I, Chapter I of the Public Works Employment Appropriations Act, Act of October 1, 1976, Pub.L. No. 94–447, 90 Stat. 1497.

2. The Economic Development Administration (EDA) of the Department of Commerce published regulations to govern its administration of this legislation. It made the following refinement on the statutory scheme: within the 30% category of reserved appropriation, priority would be given to projects whose average unemployment rate "is more than 6½ percent but not more than the average national unemployment rate for the same period of time." 13 C.F.R. § 316.7(a)(ii)(A), as published at 41 Fed. Reg. 35671 (August 23, 1976). Thus, projects from areas with unemployment rates equal to or less than 6½%, though eligible for grant money, were in the lowest priority class and would be considered "only when funding of such projects is necessary to fulfill the minimum funding level required for each State or if funds are available in the 30 percent category." 13 C.F.R. § 316.7(a)(ii)(B), at 41 Fed.Reg. 35671.

requested by both sides and approved by the Court, of the original temporary restraining order, this Court has held a day-long hearing on plaintiff's motion for a preliminary injunction. Upon consideration of the pleadings, briefs and oral arguments of counsel for all parties,[3] and for the reasons set forth below, the Court concludes that it must deny plaintiff's motion for preliminary injunctive relief.

Before reaching the consideration of the merits of the legal issues presented, some further factual background is necessary. The enactment in issue here has two primary purposes: to alleviate the problem of national unemployment, and to stimulate the national economy by assisting state and local governments build badly needed public facilities. 1976 U.S.Code Cong. & Admin. News, pp. 1746, 1747, House Report No. 94–1077.

Several provisions were included which were designed to affect the perceived unemployment problem quickly by "avoid[ing] the long lag time sometimes associated with public works programs."[4] 1976 U.S.Code Cong. & Admin.News, p. 1748.

Calculation of project area unemployment rates was a very critical portion of this program because such statistics, first, determine whether the project area qualifies for the 70 percent or 30 percent category (13 C.F.R. § 316.9(f), at 41 Fed.Reg. 35672), and, second, are one of the factors analyzed in the evaluation of applications (42 U.S.C.A. § 6706, and 13 C.F.R. § 316.-10(a)(2)(i)(B)). Congress directed that:

"[i]nformation regarding unemployment rates may be furnished either by the Federal Government, or by States or local governments, provided the Secretary determines that the unemployment rates furnished by States or local governments are accurate, and shall provide assistance to State or local governments in the calculation of such rates to insure validity and standardization."

42 U.S.C.A. § 6707(c).

EDA has implemented this statutory direction by providing that the United States Department of Labor (Bureau of Labor Statistics) will furnish unemployment data on certain standardized governmental units (CETA areas); for non-standardized areas[5] where Department of Labor Statistics are unavailable, state employment security agencies were acceptable sources for unemployment rates. 13 C.F.R. § 316.9(a), (b) at 41 Fed.Reg. 35672.

Plaintiff, City of Grand Rapids, submitted a series of fifteen applications for fifteen different public works projects for which it was seeking funding.[6] It selected

---

3. At the outset, this Court again wishes to commend counsel for both sides on the excellence of their respective briefs and oral arguments in terms of their substance, style and advocacy aspects. The Court finds it difficult to remember when it could make such a remark about the presentations of *both* parties.

4. EDA had thirty days within which to issue "rules, regulations and procedures (including application forms) necessary to carry out the Act." 42 U.S.C.A. § 6706. Determinations as to each grant application had to be made not later than the sixtieth day after receipt of the application; failure to make such a determination within that period would be deemed an approval of the grant. 42 U.S.C.A. § 6706. Grant applicants were required to give assurances that on-site labor can begin within ninety days of project approval. 42 U.S.C.A. § 6705(d).

5. Project areas for which unemployment rates were required did not have to conform to any specified boundaries (city-wide, county-wide, etc.). 42 U.S.C.A. § 6707(e). This feature of the statute was designed to allow for special treatment of "pockets of poverty," because it was recognized that city and metropolitan area unemployment statistics might not adequately reflect conditions in these neighborhoods. House Report No. 94–1077, 1976 U.S.Code Cong. & Admin.News, pp. 1750–1751. This procedure has been colorfully, but probably inaccurately, described as "gerrymandering."

6. (1) #MI 1330—Watermain Replacement
   (2) #MI 1331—Fire Station at Kalamazoo and 28th Street
   (3) #MI 1410—Sixth Street Bridge Renovation
   (4) #MI 1411—Renovation of Old Federal Building
   (5) #MI 1412—Nature Center Building
   (6) #MI 1413—Reconstruction of Leffingwell Bridge
   (7) #MI 1414—Renovation of Parking Ramps
   (8) #MI 1415—Northeast Branch Library Project
   (9) #MI 1425—Public Works Complex
   (10) #MI 1426—Transit Authority Bus Storage and Maintenance Facility
   (11) #MI 1427—General Parks Improvement
   (12) #MI 1428—Street Reconstruction and Improvement

as its project area (from which it would draw its sources of labor) Kent, Ottawa and Allegan counties. This tri-county area was a not standardized statistical area for which the federal Bureau of Labor Statistics had compiled statistics; therefore, plaintiff was required to procure the necessary data from the Michigan Employment Security Commission (MESC). Plaintiff alleges that unemployment rates have traditionally been reported to one decimal place, i. e., in tenths of a percent, and that MESC informed plaintiff that the national unemployment average for June, July and August, 1976 was, based upon data supplied by the Bureau of Labor Statistics, 7.8%, and further that the unemployment rate for plaintiff's project area during the same period was also 7.8%. If both these figures were used, plaintiff would have qualified for the 30% category of grant applicants, those whose unemployment rates were *equal to* or less than the national unemployment rate. On November 12, 1976, MESC certified to EDA the above employment rate for plaintiff's project area (7.8%) along with the raw data (labor force and number of unemployed) from which the rate was calculated. Plaintiff received, on or about December 1, 1976, what it characterizes as "preliminary approvals" for all fifteen of its project applications.[7]

On or about December 20, 1976, plaintiff became initially aware that EDA was using figures to two decimal places (i. e., in hundredths of a percent) for unemployment rates both for the nation and individual project areas. The City thereafter sought to have the actual two-decimal place figures certified by MESC using the same data already submitted. At plaintiff's request, MESC sent a telegram to EDA indicating the projects' area unemployment rates carried out to hundredths of a percent, namely, 7.77%. On December 22, 1976,

plaintiff forwarded to the EDA regional office in Chicago copies of MESC certifications for all fifteen project applications with the 7.77% unemployment rate figure. City officials assumed that the applicable national unemployment statistic used by EDA was 7.78%.

Defendant EDA had already executed its selection during December 16 through 19 (affidavit of George T. Karras, ¶ 25). On December 23, 1976, the Department of Commerce published a notice and list of proposed projects selected subject to final clearance. 41 Fed.Reg. 56146–56172. Applications not included in the list were denied. None of plaintiff's projects was contained in that list.

Plaintiff claims to be aggrieved by some of the procedures used by EDA. Primarily the city contends that EDA had an obligation to notify potential applicants that it required unemployment rates carried out to two decimal places instead of one, as had traditionally been done. The injury claimed by the plaintiff is that it was erroneously placed in the 70% category of grant applications, since its reported one decimal place unemployment rate (7.8%) had a zero added in the hundredths place by EDA (making it 7.80%), putting it above the national unemployment rate to two decimal places (7.78%). The City argues that it is entitled to be placed in the 30% category because its project area unemployment rate (7.77%) is less than the national unemployment rate of 7.78%.

■ In a situation such as this, where preliminary injunctive relief is sought, a court must analyze the case in terms of four well-settled factors: (1) whether plaintiff will be irreparably harmed absent relief, (2) whether plaintiff has shown a substantial likelihood of success on the merits, (3) whether the harm to the plaintiff significantly outweighs any injury to the

(13) #MI 1429—Streets Resurfacing
(14) #MI 1492—Plaster Creek Interceptor Sewer
(15) #MI 1430—Convention/Entertainment Center-
      Performing Arts Center

**7.** These forms, Exhibit J to the Complaint, are, more simply, acknowledgments of the receipt

of grant applications. They are important because they start the time running for the sixty-day period within which an application must be acted upon or be deemed approved by operation of law.

defendant or other interested parties, and (4) whether the public interest would be served by issuing the injunction. *S.E.C. v. Senex Corp.*, 534 F.2d 1240 (6th Cir. 1976); *Garlock, Inc. v. United Seal, Inc.*, 404 F.2d 256 (6th Cir. 1968); *Virginia Petroleum Jobbers Ass'n v. Federal Power Commission*, 104 U.S.App.D.C. 106, 259 F.2d 921 (1958); *Burkett v. Tuslaw Local School District Board of Education*, 380 F.Supp. 812 (N.D.Ohio 1974); 7 Moore's Federal Practice ¶ 67.04[1].

Plaintiff claims irreparable injury in that its allegedly erroneous inclusion in the 70% category has prevented it from having at least some of its project applications selected, which would have been the more likely result if it had been placed in the 30% category. The City claims that this injury is irreparable because the funds appropriated for the Act will shortly be completely expended.[8] "Irreparable injury" is one of the elusive legal terms of art defying reduction to a mere black-letter definition. Although courts have characterized "irreparable injury" as injury that is "both certain and great," see, e. g. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. E. F. Hutton & Co.*, 403 F.Supp. 336 (E.D.Mich.1975), citing *Washington Capitols Basketball Club Inc. v. Barry*, 304 F.Supp. 1193 (N.D.Cal.), aff'd 419 F.2d 472 (9th Cir. 1969); *West Coast Construction Co. v. Oceano Sanitary District*, 311 F.Supp. 378 (N.D.Cal.1970), this characterization does not appreciably simplify the determination whether irreparable harm exists. In the Court's view, the harm *to itself* which plaintiff is claiming is only secondary in the circumstances of this case. The City has mainly argued that it will be deprived of the actual projects for which it sought federal funding. However, the overriding purpose of the legislation was to reduce unemployment, not to construct particular projects in particular areas. One of the counties which plaintiff chose to include as a part of its project area is Ottawa County. Eight projects in the 30% category

from Ottawa County (with a value of $11.2 million) have been selected subject to final clearance and some of these have received final approval and offers of a grant. In light of the unique statutory purposes, no one particular grant applicant has a vested interest or any sort of monopoly in being the agent whose public works projects are the vehicle for reducing unemployment. The legislation is not so concerned with *who* is employing presently unemployed persons, but that *someone* is. Thus, the Court, recognizing that plaintiff has the burden of proof on the issue of irreparable *harm to* the plaintiff, finds that plaintiff has not met such burden for the project area which it selected.

Even assuming arguendo that plaintiff would be irreparably harmed unless preliminary injunctive relief is granted, this does not *entitle* that party to such relief. "The award of an interlocutory injunction by courts of equity has never been regarded as strictly a matter of right, even though irreparable injury may otherwise result to the plaintiff." *Yakus v. United States*, 321 U.S. 414, 440, 64 S.Ct. 660, 674, 88 L.Ed. 834, 857 (1944). Irreparable harm to the applicant is a necessary, but not a sufficient, element for the issuance of a preliminary injunction. The earlier-stated four-pronged test has uniformly been interpreted as requiring an exercise of discretion via a balancing approach of all factors. *See* 7 Moore's Federal Practice ¶ 65.04[2]. The presence of irreparable harm is therefore but one factor to be weighed.

Plaintiff's position on the substantive merits of the case is essentially that defendants acted in violation of the statutory limits of their authority and failed to fairly and equitably evaluate all of the applications received; acted in violation of the notice requirement of the Administrative Procedure Act (5 U.S.C. § 553); failed to abide by their own published regulations; failed to provide actual or constructive no-

---

**8.** The defendants have advised the Court that from the State of Michigan alone 1662 applications were received for a total value of $2.08 billion, while Michigan's allocation of the $2 billion national "pot" is only $158 million. EDA selected for final processing only 104 applications from Michigan (57 in the 70% category and 47 in the 30% category).

tice of changes in the standards to be followed in applying for grants in violation of elementary principles of due process; and that in so acting, defendants committed error prejudicial to the rights and interests of the plaintiff. Both sides agree that judicial review under the Administrative Procedure Act is appropriate under the "arbitrary, capricious, an abuse of discretion" standard. 5 U.S.C. § 706(2)(A). Informal agency determinations, such as involved here, are to be evaluated under the above standard as interpreted in *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). The court must pursue a "thorough, probing, in-depth review", *id.* at 415, 91 S.Ct. 814, of whether the agency acted within the scope of its authority, *id.*, and also whether the decision was based on a consideration of the relevant factors and whether there has been a clear error in judgment, *id.* at 416, 91 S.Ct. 814.

■ Plaintiff has relied heavily on the argument that EDA was obligated to notify potential grant applicants of its "requirement" that unemployment rates be computed to two decimal places. *Rodway v. United States Department of Agriculture*, 168 U.S.App.D.C. 387, 514 F.2d 809 (1975) is inapposite on this point. There the agency, although exempt from the formal rule-making requirements of the Administrative Procedure Act via 5 U.S.C. § 553(a)(2), had promulgated a regulation making the procedural requirements of 5 U.S.C. § 553 applicable to all of its rule-making activities. In the present case EDA recognized in its initial rule-making publication (41 Fed.Reg. 35670) that it was exempt from the Administrative Procedure Act procedural requirements because it was a grant matter (5 U.S.C. § 553(a)(2)), but never adopted any regulation as did the agency in *Rodway*, supra. The statement accompanying the August 23, 1976 regulations did state that EDA would accept and consider written comments or suggestions, but couldn't do so beforehand because the statute mandated that the implementing regulations be prescribed within thirty days after enactment (42 U.S.C.A. § 6706). It provided that "un-

til such time as further changes are made, however, [these regulations] shall remain in effect, thus permitting the public business to proceed more expeditiously." 41 Fed. Reg. 35670. EDA was never subject to the formal requirements of 5 U.S.C. § 553.

■ Plaintiff has also strenuously argued that EDA breached its duty of fair dealing with grant applicants by providing vague standards and by applying standards without prior notice. *Bamford v. Federal Communications Commission*, 175 U.S.App. D.C. 250, 535 F.2d 78, *cert. denied*, 429 U.S. 895, 97 S.Ct. 255, 50 L.Ed.2d 178 (1976), spoke of a principle of "elementary fairness." *Id.* at 82. The City's complaint along these lines is that EDA violated this notion by implementing different and unpublished standards, namely, by switching from a requirement of one decimal place figures to one of two decimal places. This Court accepts the notion that administrative agencies must proceed with "elementary fairness," but merely stating the principle does not resolve the issues. Our task in this proceeding is to determine the dimensions of such essential fairness, and to analyze the defendants' actions within that framework.

■ The Court must initially note that neither the statute nor any of the regulations contains any language mentioning (let alone directing) the use of *either* single or double decimal place unemployment rates. Indeed, EDA concedes that it had no formal specific policy on that point and that it was willing to accept whatever figures were certified to it by state employment security agencies or by the federal Bureau of Labor Statistics, whether they were single, double, triple or even quadruple decimal point computations. Although the federally supplied statistics were calculated to two decimal places, the majority of state unemployment security agencies certified figures to only one decimal place. EDA has represented that it considers both types of statistics to be "reasonably accurate" measures of unemployment, and therefore fulfilled the statutory mandate to assist "in the calculation of such rates to

insure *validity* and *standardization.*" 42 U.S.C.A. § 6707(c) (emphasis added). EDA claims therefore that there never was any *change* in its policy on calculation of unemployment rates. This Court agrees with that conclusion and further finds that EDA did not violate any basic due process notions when, without prior notice, it added a zero to the hundredths place of those submitted unemployment rates which had been calculated to only one decimal place, instead of actually carrying out the computation using the raw data already provided. Although plaintiff may, because of its unique position on the unemployment scale, have received an unfortunate result from EDA's procedure, the Court cannot say that the agency committed error, abused its discretion or acted arbitrarily or capriciously within the meaning of *Citizens to Preserve Overton Park, Inc. v. Volpe, supra.* The Court must observe that the above conclusion is not an ultimately final position. Upon an application for preliminary injunctive relief, a court must consider the *probability* or *likelihood* of success of plaintiff's case on the merits, and the Court has made its above conclusion on the basis of the facts and law available to it at the present time. EDA's decision not to accept plaintiff's December 22, 1976 resubmissions or amendments after the December 3 and 9, 1976 deadlines (41 Fed. 51053–51054, November 19, 1976) was also not improper, keeping in mind the court's narrow scope of review.[9]

The next factor to be considered is the balance of injury as between plaintiff and defendants. EDA has maintained that it is still operating under Congressional deadlines and if the injunction is granted, it would have to completely rescore, rerank and reselect applications in both the 70% and 30% categories in Michigan (and quite likely elsewhere). To prohibit even just the disbursal of funds already committed would run counter to the express Congressional intent to implement this program quickly.[10] The Court concludes that defendants will be frustrated in the implementation of the program and that other potential recipients (intervenors) would suffer significant harm if the requested injunction issues, and that plaintiff's harm does *not* substantially outweigh defendants'.

The final factor for consideration is the public interest. This is not a case involving only private interests. In fact, questions of "public interest" predominate. In this situation, the effect of issuance or denial of an injunction on the public interest becomes of paramount importance. *Yakus v. United States*, 321 U.S. 414, 440–441, 64 S.Ct. 660, 88 L.Ed. 834 (1944). Affidavits have been submitted from several interested parties, who are also seeking to intervene in this suit. They are grant applicants whose projects were all provisionally selected by EDA on December 23, 1976, and most of whom have received and accepted final offers of grants. Several of those in the latter category have already entered financial commitments to certain architectural and engineering firms so as to comply with their previously-given assurances that on-site labor can begin within ninety days of project approval. The Court notes that several of these affiants, are units of government in Ottawa County, which is also part of plaintiff's project area. Thus, to hold up this program

---

9. Other issues raised in defendant's brief and argument, for example, failure to join indispensable parties (F.R.Civ.P. 19), and the availability of mandatory relief against the defendants under 28 U.S.C. § 1361, need not be resolved at this time.

10. The quick-action nature of this program will be frustrated by any explosion of litigation by those who consider themselves offended by the conduct of EDA. This Court is tremendously sympathetic to unsuccessful applicants. In this area most familiar to the Court, plaintiff was one of thousands of applicants, nation-wide, vying for the $2 billion appropriated by Congress. An aggregate of 25.4 thousand grant applications requesting $23.9 billion (more than ten times the amount of funds available) were submitted. Only 1988 were selected for further processing. Not only has plaintiff petitioned this Court for an immediate hearing but another disappointed applicant (Benton Harbor) has requested an injunction to freeze the 70% distribution in Michigan as well. *City of Benton Harbor v. Richardson*, 429 F.Supp. 1096, filed on January 10, 1977, 10 days after the instant suit was commenced.

as plaintiff seeks (even temporarily) would actually be to harm some of those unemployed people about whom plaintiff claims it is concerned and solicitous. This apparent inconsistency troubles the Court. Additionally, the Court generally accepts the idea that the proper role of the judicial branch in our political system is not to right every perceived wrong; the legislature and the executive have primary responsibility in addressing problems such as are presented in this case. *See* Adams, *Judicial Restraint, the Best Medicine*, 60 J.Am.Jud.Soc'y. 179 (November 1976). This Court concludes that very substantial harm will occur to the public interest if the preliminary injunction is granted.[11]

■ In summary, then, upon careful consideration of all the relevant factors and with a true appreciation of the consequences its decision either way would entail, the Court holds that plaintiff has not discharged its burden on the question of the propriety of the requested preliminary relief. Therefore, plaintiff's motion for a preliminary injunction will be and hereby is DENIED.

IT IS SO ORDERED.

---

11. Although it is suggested by plaintiff that the matter may be ready for a decision under the provisions of F.R.Civ.P. 56, this Court must point out that its docket is heavily committed for several months in the future, and the great majority of these scheduled cases have already waited up to several years for their "day in court." According to the most recent (September 1976) report of the Administrative Office of the United States Courts, there is now an average civil docket per United States District Judge of 365 cases. As of December 31, 1976, this Court had 766 civil cases on its docket.

Included is K 74–323, which is generally conceded to be the largest ($650,000,000) case in the United States, which is expected to take from 18 months to two years to be tried. This Court commenced a January Trailer Docket of 15 major civil cases on January 11th to be completed by February 26th, so that this Court can begin its Northern Division Trial Docket (Marquette) on the 28th of February. Most of these cases were filed in 1973 and litigants have been waiting upwards of four years to have their cases heard.