**CITY OF BENTON HARBOR, a Municipal Corporation, Plaintiff,**

v.

**Elliott L. RICHARDSON, Secretary of Commerce, and John W. Eden, Assistant Secretary of Commerce for Economic Development, United States of America, Defendants.**

**No. K 77–18 CA 8.**

United States District Court, W. D. Michigan, S. D.

Jan. 31, 1977.

See also, D.C., 429 F.Supp. 1087.

---

Yvonne L. Hughes, Benton Harbor, Mich., for plaintiff.

John H. Bauckham, Kalamazoo, Mich., for intervening defendant.

Robert S. Fastov, Dept. of Commerce, Washington, D. C., Frank Spies, U. S. Atty., Grand Rapids, Mich., for defendants.

## OPINION

MILES, District Judge.

This suit arises out of the administration of Title I (the Local Public Works Capital Development and Investment Act of 1976, 42 U.S.C.A. §§ 6701–6710 (Supp. 4, 1976)) of the Public Works Employment Act of 1976, 42 U.S.C.A. § 6701 *et seq.* (Supp. 4, 1976), Pub.L. No. 94–369, 90 Stat. 999. This legislation establishes a program of federal grants primarily for the construction, renovation, repair, or other improvement of local public works projects. *See* 42 U.S.C.A. § 6702. It authorized an appropriation of $2 billion ($2,000,000,000)[1] for these purposes (42 U.S.C.A. § 6710), to be allocated to projects according to a stated scheme. Seventy percent (70%) of this sum was to be directed to projects from areas with unemployment rates (for the three most recent consecutive months) *in excess of* the national unemployment rate; and the remaining thirty percent (30%) was reserved for projects from areas with unemployment rates *equal to or less than* the national unemployment rate.[2] 42 U.S.C.A. § 6707(c), (d).

Plaintiff, the City of Benton Harbor, challenged the Economic Development Administration's (EDA) treatment of plaintiff's grant application under the above Act. This Court has previously denied plaintiff's application for a temporary restraining order on January 14, 1977, and has set the matter down for a prompt hearing on plaintiff's motion for a preliminary injunction. The requested injunction sought to restrain the defendants from

"disbursing any of the funds to the cities listed on Exhibit (sic) as being qualified in the '70% area' until . . . final hearing can be had on the above matter; . . . or in the alternative that this Court determine and declare that plaintiff is a qualified applicant insofar as that term now applies to all other applicants appearing on Exhibit (sic); and find as a matter of fact and law that defendants therefore should be directed, ordered, and compelled to include plaintiff among those applicants so qualified, and to administer the provisions of the Act so as to insure fair and equal treatment to plaintiff along with all other such applicants . . . ."

The hearing was held on January 24, 1977, after briefs had been filed by both sides. Upon consideration of the pleadings, briefs and oral arguments of counsel for all parties, and for the reasons set forth below, the Court concludes that it must deny plaintiff's motion for preliminary injunctive relief.

The enactment in issue here has a two-fold purpose: "(1) to alleviate the problem of national unemployment, and (2) to stimulate the national economy by assisting State and local governments build badly needed public facilities." H.R.Rep. No. 94–1077, 94th Cong., 2d Sess. 2, 1976, U.S. Code Cong. & Ad. News, pp. 1746, 1747.[3] Several

---

1. This amount was subsequently appropriated by Title I, Chapter I of the Public Works Employment Appropriations Act, Act of October 1, 1976, Pub.L. No. 94–447, 90 Stat. 1497.

2. The Economic Development Administration (EDA) of the Department of Commerce published regulations to govern its administration of this legislation. It made the following refinement on the statutory scheme: within the 30% category of reserved appropriation, priority would be given to projects whose average employment rate "is more than 6½ percent but not more than the average national unemployment rate for the same period of time." 13 C.F.R. § 316.7(a)(ii)(A), as published at 41 Fed. Reg. 35671 (August 23, 1976). Thus, projects from areas with unemployment rates equal to or less than 6½%, though eligible for grant

money, were in the lowest priority class and would be considered "only when funding of such projects is necessary to fulfill the minimum funding level required for each State or if funds are available in the 30 percent category." 13 C.F.R. § 316.7(a)(ii)(B), at 41 Fed.Reg. 35571.

3. In several sections of its complaint (¶ 6, ¶ 14) and brief (pp. 5–6 and Exhibit G), plaintiff discusses "antirecession and counter-cyclical assistance . . . to those governments most affected by the recession" and Title II of the Public Works Employment Act of 1976, 42 U.S.C.A. §§ 6721–6735. However, these particular provisions (Title II) are not at all implicated in the controversy before the Court, which concerns only Title I.

provisions[4] were included which were designed to affect the perceived unemployment problem quickly by "avoid[ing] the long lag time sometimes associated with public works programs." H.R.Rep. No. 94–1077, supra, at 3, 1976 U.S. Code Cong. & Ad. News, p. 1748.[5]

The statute directed the administrative agency, during its processing and selecting grant applications, to

"consider among other factors (1) the severity and duration of unemployment in proposed project areas, (2) the income levels and extent of underemployment in proposed project area, and (3) the extent to which proposed projects will contribute to the reduction of unemployment." 42 U.S.C.A. § 6706.

Applicants were asked to relate their application projects to existing approved plans and programs of a local community or regional development nature, and, where feasible, to longer range plans and programs. 42 U.S.C.A. § 6707(g).

In order to implement these Congressional directions, EDA developed a project selection procedure. 13 C.F.R. § 316.10(a) as amended, 41 Fed.Reg. 46422 (October 20, 1976). Initially there was a scoring and ranking process, involving a formula designed to take account of the above-mentioned factors. A project's basic rank was determined using four factors: (1) number of unemployed workers in the project area (30%); (2) unemployment rate prevailing in the project area (25%); (3) labor intensity on a cost basis (30%); and (4) level of income prevailing in the project area (15%). 13 C.F.R. § 316.10(a)(2)(i)(A)–(D), 41 Fed. Reg. 46422. This basic rank was subject to increase by certain "bonus" factors: (1) potential for providing long-term benefits (up

to 10%); (2) sponsored by a general purpose unit of local government (5%); (3) sponsored by special purpose unit of local government or a political subdivision of a State (3%); and (4) relates to existing approved plans and programs of a local community or regional development nature or promotes or advances longer range plans and programs (5%). 13 C.F.R. § 316.-10(a)(2)(ii)(A)–(D), 41 Fed.Reg. 46422. Fund allocations were made on a state-by-state basis (13 C.F.R. § 316.8(b), (c), 41 Fed.Reg. 46421), and projects were assessed against others from the same priority category (70% or 30%) in the same state. 13 C.F.R. § 316.10(a)(3)(i), (ii), 41 Fed.Reg. 46422. Project selection was accomplished by giving primary consideration to final rankings, but EDA could approve projects ranking below others in order to avoid an undue geographic concentration of program assistance in any particular area or areas of a State or to meet the required distribution of program resources between the statutorily mandated priority classes or when the sum of the total project labor requirements in a project area exceeded the available labor. 13 C.F.R. § 316.10(a)(3)(iii), 41 Fed. Reg. 46422.

Plaintiff, City of Benton Harbor, submitted three project applications[6] to the EDA Regional Office in Chicago. None of plaintiff's applications appeared in the list of projects selected for final processing. 41 Fed.Reg. 56146–56172 (December 23, 1976). All applications not included in this list were denied. Benton Harbor claims that the majority, if not all, of the applicants deemed "qualified" appearing on this list reported lower percentage of employment, a smaller number of unemployed workers, a higher ratio of total project costs to the

---

**4.** EDA had thirty days within which to issue "rules, regulations and procedures (including application forms) necessary to carry out the Act." 42 U.S.C.A. § 6706. Determinations as to each grant application had to be made not later than the sixtieth day after receipt of the application; failure to make such a determination within that period would be deemed an approval of the grant. 42 U.S.C.A. § 6706. Grant applicants were required to give assurances that on-site labor can begin within ninety

days of project approval. 42 U.S.C.A. § 6705(d).

**5.** See Exhibit 3 to defendants' Brief, "Legislative History on the Need for Expeditious Implementation of the LPW Act."

**6.** MI–0722 Pleasure Boat Marina
MI–0723 Pavement and Sidewalk Improvements
MI–0724 Sewer Improvements

total number of person-months of employment,[7] and a higher level of income in the project area than itself. Plaintiff further claims that very few, if any, of the projects deemed "qualified" had greater potential for providing long-term benefits or any greater relationship to existing approved plans of a local community or regional development nature or a greater ability to advance longer range plans and programs. Thus, in essence, plaintiff contends that it was more "deserving" of a grant than others, including the one Berrien County project that was selected (Lake Michigan College District Cultural, Civic and Convention Center), and that its failure to be selected was "arbitrary, capricious, abusive of discretion, and discriminatory."

■ At the current stage of this case where preliminary injunctive relief is sought, a court must analyze the situation in terms of four well-settled factors: (1) whether plaintiff will be irreparably harmed absent relief, (2) whether plaintiff has shown a substantial likelihood of success on the merits, (3) whether the harm to the plaintiff significantly outweighs any injury to the defendant or other interested parties, and (4) whether the public interest would be served by issuing the injunction. *See S.E.C. v. Senex Corp.*, 534 F.2d 1240 (6th Cir. 1976); *Garlock, Inc. v. United Seal, Inc.*, 404 F.2d 256 (6th Cir. 1968); *Virginia Petroleum Jobbers Ass'n v. Federal Power Commission*, 104 U.S.App.D.C. 106, 259 F.2d 921 (1958); *Burkett v. Tuslaw Local School District Board of Education*, 380 F.Supp. 812 (N.D.Ohio 1974); 7 Moore's Federal Practice ¶ 65.04[1].

■ Plaintiff claims irreparable injury "to the extent that it would be unable to participate in this program although it is fully and adequately qualified under the established law and regulation." It con-

tends that this injury is irreparable because the funds appropriated for the Act will shortly be completely expended.[8] "Irreparable injury" is one of the elusive legal terms of art defying reduction to a mere black-letter definition. Although courts have characterized "irreparable injury" as injury that is "both certain and great," *see, e. g. Merrill Lynch, Pierce, Fenner & Smith, Inc. v. E. F. Hutton & Co.*, 403 F.Supp. 336 (E.D.Mich.1975), citing *Washington Capitols Basketball Club Inc. v. Barry*, 304 F.Supp. 1193 (N.D.Cal.), aff'd 419 F.2d 472 (9th Cir. 1969); *West Coast Construction Co. v. Oceano Sanitary District*, 311 F.Supp. 378 (N.D. Cal.1970), this characterization does not appreciably simplify the determination whether irreparable harm exists. In the Court's view, the harm *to itself* which plaintiff is claiming is only secondary in the circumstances of this case. The City has mainly argued that it will be deprived of the actual projects for which it sought federal funding. However, the overriding purpose of the legislation was to reduce unemployment, not to construct particular projects in particular areas. One project (with a value of $5.29 million) in the 70% category from Berrien County (in which plaintiff is located and from which it would draw its labor force) has been selected subject to final clearance.

■ In light of the unique statutory purposes, no one particular grant applicant has a vested interest or any sort of monopoly in being the agent whose public works projects are the vehicle for reducing unemployment. The legislation is not so concerned with *who* is employing presently unemployed persons, but that *someone* is. Thus, the Court, recognizing that plaintiff has the burden of proof on the issue of irreparable *harm to* the plaintiff, finds that

---

7. While this factor (cost per person-month of employment) was originally published as one of the basic rank factors (13 C.F.R. § 316.-10(a)(2)(i)(C), 41 Fed.Reg. 35672 (August 23, 1976), it was subsequently replaced by labor intensity on a cost basis. 41 Fed.Reg. 45129 (October 14, 1976).

8. The defendants have advised the Court that from the State of Michigan alone 1662 applications were received for a total value of $2.08 billion, while Michigan's allocation of the $2 billion national "pot" is only $158 million. EDA selected for final processing only 104 applications from Michigan (57 in the 70% category and 47 in the 30% category).

plaintiff has not met such burden for the project area which it selected.

Even assuming arguendo that plaintiff would be irreparably harmed unless preliminary injunctive relief is granted, this does not *entitle* that party to such relief. "The award of an interlocutory injunction by courts of equity has never been regarded as strictly a matter of right, even though irreparable injury may otherwise result to the plaintiff." *Yakus v. United States,* 321 U.S. 414, 440, 64 S.Ct. 660, 674, 88 L.Ed. 834, 857 (1944). Irreparable harm to the applicant is a necessary, but not a sufficient, element for the issuance of a preliminary injunction. The earlier-stated four-pronged test has uniformly been interpreted as requiring an exercise of discretion via a balancing approach of all factors. *See* 7 Moore's Federal Practice ¶ 65.04[2]. The presence of irreparable harm is therefore but one factor to be weighed.

Plaintiff's position on the substantive merits of the case is that EDA made errors in processing its application and at least one other from Berrien County (Lake Michigan College District), and that EDA improperly allocated funds on a state-by-state basis, and that EDA's establishment of "county benchmarks" was improper.

Judicial review is appropriate under the "arbitrary, capricious, an abuse of discretion" standard of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A). Informal agency determinations, such as involved here, are to be evaluated under the above standard as interpreted in *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). The court must pursue a "thorough, probing, in-depth review", *id.* at 415, 91 S.Ct. 814, of whether the agency acted within the scope of its authority, *id.,* and also whether the decision was based on a consideration of the relevant factors and whether there has been a clear error in judgment, *id.* at 416, and finally, whether the agency's action followed the necessary procedural requirements, *id.* at 417, 91 S.Ct. 814.

Plaintiff argues that it was wrong for EDA to give plaintiff's applications only 5% on the bonus factor for long-term benefits, while giving Lake Michigan College's project the maximum 10% on this factor. EDA developed guidelines to give uniformity to its discretionary decisions on the long-term benefit factor, *see* Exhibit 6 to Karras affidavit, "Procedural Paper for Administering the LPW Program" (September 14, 1976) at pp. 9–10, where the amount of increase was to be determined by the nature and extent of the long-term benefits to be provided, 13 C.F.R. § 316.-10(a)(2)(ii)(A), 41 Fed.Reg. 46422. The court's standard of review here is a narrow one, and it is not permitted to substitute its own judgment for that of the agency. *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. at 416, 91 S.Ct. 814. This Court is of the opinion that EDA's decision on how many points to award plaintiff's projects on the long-term benefits factor was clearly within the range of its permissible discretion, and was not arbitrary or capricious. Even if this Court did find that Benton Harbor should have received the maximum 10% bonus on this factor, it is by no means clear that plaintiff's chances of receiving grant money would thereby be increased. Benton Harbor's three projects ranked as Nos. 723, 984, and 987 out of 1392 applications in the 70% category in Michigan. Affidavit of Christos N. Kyriazi, p. 2 and Exhibit D thereto. Recomputation of the Benton Harbor applications using 10% for the long-term benefits factor (instead of the original 5%) would result in plaintiff's applications being ranked as Nos. 475, 734 and 735. The lowest ranked applicant selected was No. 226, and there remained, even after recomp'utation of Benton Harbor's applications, at least six applications from Berrien County *ahead* of plaintiff's.

Plaintiff has also challenged the data supplied for Lake Michigan College's project application on the per-capita income factor. Plaintiff claims that Lake Michigan College's application listed the same figure for per-capita income as Benton Harbor's, although Lake Michigan College's project area was larger, (Benton Harbor city and

Benton Township) than plaintiff's. The Court notes that the per-capita income factor is supplied by EDA from 1972 statistics from the Census Bureau for the Treasury Department's General Revenue Sharing Program. Exhibit 6 to Karras affidavit, "Procedural Paper for Administering the LPW Program" (September 14, 1976), p. 7. The income data in this factor is for the political *"jurisdiction"* of the applicant, not its *project area.* 13 C.F.R. § 316.-10(a)(2)(i)(D), 41 Fed.Reg. 46422. The Court is not convinced that EDA made any "clear error of judgment" in this matter or otherwise abused its discretion. Even if Lake Michigan College's scoring sheet did contain an error on this factor, per-capita income was the least weighted (15%) component of basic rank, and several other applications from Berrien County (which plaintiff has not challenged) still rank higher than plaintiff's.

■ Plaintiff has also attacked EDA's method of allocating funds on a state-by-state basis. EDA made planning allocations for states on the basis of ratios of a state's number of unemployed and rate of unemployment to the nation's number of unemployed and rate of unemployment respectively. *See* 13 C.F.R. § 316.8(b), 41 Fed.Reg. 46421. Then after a state's total allocation was calculated, the statutory 70%–30% division was made. Benton Harbor asserts that EDA could have allocated 70% of the appropriated funds to high unemployment states and the remaining 30% to low unemployment states, with the hopeful result that Michigan, in this manner, would have received more than the $158 million share of the $2 billion national "pot." EDA has responded that it tried plaintiff's suggested allocation method, along with others, but concluded that none of them worked as satisfactorily as the one actually used. EDA also advised the Court that Congress conducted oversight hearings on these regulations shortly after they were

initially published and did not criticize them. *See* Joint Hearing Before Subcommittee on Economic Development and Subcommittee on Investigations and Review of the House Committee on Public Works and Transportation, 94th Cong., 2d Sess., "Public Works Employment Act of 1976, Review of Regulations to Title I—the Local Public Works Capital Development & Investment Program," August 31, 1976. Finally, EDA argues that there was no statutory direction as to allocation methods, and that the choice of such a method was thus within EDA's discretion, which it did not abuse. The Court is impressed with all three of these EDA arguments, and finds that EDA did not err on this point.

■ Plaintiff complains of the county benchmark concept used by EDA, and especially of the "secrecy" of this procedure. EDA devised the county benchmarks as a means of avoiding undue concentration of program assistance in various areas. Affidavit of George Karras, ¶ 19–20. This was certainly a reasonable step to take in administering this program; it was not contrary to, but rather was effective in accomplishing the Congressional purpose, and was not arbitrary, capricious or an abuse of discretion. Plaintiff has neither shown nor suggested that its project applications were treated unfairly under this valid agency regulation or procedure.

Although plaintiff would seem to merit consideration for a grant under this program because of its steep unemployment rate (22.2%), the legal question here is whether under the circumstances EDA abused its discretion in setting up its guidelines or in implementing them. The Court finds that it did not. While the above conclusions are not (and cannot be) final conclusions on the matters dealt with, the Court is left with the distinct impression that plaintiff's case on the merits is not strong enough to support preliminary injunctive relief.[9]

9. Other issues raised in defendants' brief and argument, for example, failure to join indispensable parties (F.R.Civ.P. 19), and the availa-

bility of mandatory relief against the defendants under 28 U.S.C. § 1361, need not be resolved at this time.

The next factor to be considered is the balance of injury as between plaintiff and defendants. EDA has maintained that it is still operating under Congressional deadlines and if the injunction is granted, it would have to rescore, rerank and reselect applications in at least the 70% category in Michigan (and quite likely elsewhere). to prohibit even just the disbursal of funds already committed would run counter to the express Congressional intent to implement this program quickly.[10] The Court concludes that defendants will be frustrated in the implementation of the program and that other potential recipients (intervenors) would suffer significant harm if the requested injunction issues, and that plaintiff's harm does *not* substantially outweigh defendants'.

The final factor for consideration is the public interest. This is not a case involving only private interests. In fact, questions of "public interest" predominate. In this situation, the effect of issuance or denial of an injunction on the public interest becomes of paramount importance. *Yakus v. United States,* 321 U.S. 414, 440–441, 64 S.Ct. 660, 88 L.Ed. 834 (1944). Affidavits have been submitted from several interested parties, who are also seeking to intervene in this suit. They are grant applicants whose projects were all provisionally selected by EDA on December 23, 1976, and most of whom have received and accepted final offers of grants. Several of those in the latter category have already entered financial commitments to certain architectural and engineering firms so as to comply with their previously-given assurances that on-site labor can begin within ninety days of project approval. As the Court noted previously, one project from Berrien County had been selected sub-ject to final clearance. While the Court does not know if this project has actually received final approval and an offer of a grant, no reason has been shown as to why it wouldn't receive such an offer. Thus, to hold up this program as plaintiff seeks (even temporarily) would actually be to harm some of those unemployed people about whom plaintiff claims it is concerned and solicitous. This apparent inconsistency troubles the Court. Additionally, this Court generally accepts the idea that the proper role of the judicial branch in our political system is not to reach out for and right every perceived wrong. *See* Adams, *Judicial Restraint, the best medicine,* 60 J.Am. Jud.Sco'y. 179 (November 1976). This Court concludes that very substantial harm will occur to the public interest if the preliminary injunction is granted.

In summary, then, upon careful consideration of all the relevant factors and with a true appreciation of the consequences its decision either way would entail, the Court holds that plaintiff has not discharged its burden on the question of the propriety of the requested preliminary relief. Therefore, plaintiff's motion for a preliminary injunction will be and hereby is DENIED.

IT IS SO ORDERED.

---

10. The quick-action nature of this program will be frustrated by any explosion of litigation by those who consider themselves offended by the conduct of EDA. This Court is tremendously sympathetic to unsuccessful applicants. In this area most familiar to the Court, plaintiff was one of thousands of applicants, nationwide, vying for the $2 billion appropriated by Congress. An aggregate of 25.4 thousand grant applications requesting $23.9 billion (more than ten times the amount of funds available) were submitted. Only 1988 were selected for further processing. Not only has plaintiff petitioned this Court for an immediate hearing but another disappointed applicant (Grand Rapids) has requested an injunction to freeze the 30% distribution in Michigan as well. *City of Grand Rapids v. Richardson,* 429 F.Supp. 1087 (W.D.Mich.1977).