The CITY OF NEWBURGH and James R. Taylor, City Manager, Plaintiffs,

v.

Secretary of Commerce, Elliott J. RICHARDSON and Assistant Secretary of Commerce, John W. Eden, Defendants.

No. 77 Civ. 127.

United States District Court, S. D. New York.

June 20, 1977.

**1052**

Charles D. Conway, Newburgh, N. Y., for plaintiffs.

Robert B. Fiske, Jr., U.S. Atty., for the Southern District of New York, New York City, for defendants, of counsel, Eileen M. Fitzgerald, Asst. U.S. Atty., New York City, Robert S. Fastov, Asst. Chief Counsel, John E. Kennahan, Attorney Advisor, Office of Chief Counsel, Economic Development Administration, Washington, D.C.

LASKER, District Judge.

The City of Newburgh and various of its officials (hereinafter collectively referred to as "the plaintiff") sue the Secretary of Commerce and subordinate federal officials for declaratory and injunctive relief under 28 U.S.C. § 1331. Newburgh claims that its application for assistance under the Local Public Works Capital Development and Investment. Act of 1976 ("LPWA" or "the Act"), 42 U.S.C. § 6701 et seq. was improperly denied. Specifically, it asserts that regulations adopted by the Secretary are not in compliance with the statute and moreover that the agency's action is not in compliance with its own regulations. 13 C.F.R. Part 316 (1976). Originally, plaintiff moved for a temporary restraining order and preliminary injunction restraining the Secretary from awarding and disbursing any grant funds under the Act and from enforcing rules and regulations promulgated by the Secretary pursuant to his authority under the Act. On the government's agreement to withhold $3,500,000. of the $2 billion available for grants under the Act until disposition of the motion for a preliminary injunction, the motion for a temporary restraining order was denied. (Endorsement of Jan. 14, 1977). Plaintiff has since informally modified and restricted its request for preliminary injunctive relief and now seeks only to enjoin expenditure of the funds which would be required to grant its application.[1]

■ The purposes of LPWA were to provide employment opportunities in areas of high unemployment through the expeditious construction or renovation of useful public works, and to afford a countercyclical stimulus to the national economy. House Rep. No. 94–1077, 1976 *U.S. Code Cong. & Admin. News* 1746, 1747; 13 C.F.R. Part 316, *Statement of Objectives.*

It was of particular importance to Congress in enacting this legislation "to avoid the long lag time sometimes associated with public works programs." *U.S. Code Cong. & Admin. News, supra,* at 1748. Its intent in this regard is evidenced in three provisions of the Act. Section 107 requires the Secretary to promulgate regulations governing distribution of funds available under the Act within thirty days of its passage. It also provides that any application for assistance which is not rejected within sixty days of its receipt is deemed to have been accepted. Finally, Section 106(d) provides that grants may be made "only for projects for which the applicant gives satisfactory assurances . . . that if funds are available, on-site labor can begin within ninety days of project approval."

---

1. See plaintiff's Response Memorandum of February 18, 1977.

The sixty day approval provision of § 107 placed special pressure on the Secretary to act quickly, particularly in light of the number of applications and the limited funds available. October 26, 1976 was designated as the first day on which applications for assistance would be accepted. Within days "it became apparent from the flood of applications then flowing into EDA's [Economic Development Administration] six Regional Offices that more than enough project applications would be received during the first sixty days to . . . exhaust the two billion dollars appropriated by Congress." Affidavit of George T. Karras, Director of Office of Public Works of EDA, U.S. Department of Commerce, ¶ 12. Thus, the potential beneficiaries were advised that applications would have to be received by early December in order to receive consideration. Nationwide, the agency received over 25,000 applications requesting approximately 23.9 billion dollars in financial assistance. Karras Affidavit, *supra*, ¶ 13. From this group, within a period of two months, the agency was required to apply statutory selection criteria and designate those projects which would receive the two billion dollars appropriated by Congress.

The Secretary was directed to consider the following factors in promulgating rules and regulations to carry out the Act: "(1) the severity and duration of unemployment in proposed project areas, (2) the income levels and extent of underemployment in proposed project areas, and (3) the extent to which proposed projects will contribute to the reduction of unemployment." LPWA, § 107. Section 107 also directs that the Secretary's rules "shall assure that adequate consideration is given to the relative needs of various sections of the country," and that in considering the extent of unemployment or underemployment, "the Secretary shall consider the amount of unemployment or underemployment in the construction and construction-related industries."

Section 108 establishes additional constraints and priorities on grant allocation. Section 108(a) requires that no more than 12 1/2% and no less than 1/2% of the total funds appropriated by Congress be spent in each state of the union. Subsection (b) gives priority to public works projects submitted by general local government units.

Subsection (e) permits localities to submit unemployment figures for a proposed project area consisting of a neighborhood within a governmental unit, if the proposed project would reduce unemployment in that neighborhood; subsection (f) permits applicants to designate their project area to include adjoining localities and to use unemployment figures for such areas under some circumstances.

Of particular importance are subsections (c) and (d), which require the Secretary to allocate 70% of the available funds to public works projects submitted by States or local governments "having unemployment rates for the three most recent consecutive months in excess of the national unemployment rate," but also require that the remaining 30% be made available for applicants with unemployment rates below the national average.[2] In other words, the Act establishes a "70% pot" and a "30% pot" for applicants respectively above or below the national unemployment rate.

---

2. The applicable portions of the Act provide that:

"(c) In making grants under this Act, if for the three most recent consecutive months, the national unemployment rate is equal to or exceeds 6½ per centum, the Secretary shall (1) expedite and give priority to applications submitted by States or local governments having unemployment rates for the three most recent consecutive months in excess of the national unemployment rate and (2) shall give priority thereafter to applications submitted by States or local governments having unemployment rates for the three most recent consecutive months in excess of 6 1/2 per centum, but less than the national unemployment rate. . . .

(d) Seventy per centum of all amounts appropriated to carry out this Act shall be granted for public works projects submitted by State or local governments given priority under clause (1) of the first sentence of subsection (c) of this section. The remaining 30 per centum shall be available for public works projects submitted by State or local governments in other classifications of priority."

To implement these statutory criteria, the Secretary provided by regulation that projects for which funding was requested would be given a "basic rank" as follows: (1) number of unemployed workers in the project area over the most recent three months—30% of the basic rank; (2) the unemployment rate in the project area over the last three months—25% of the basic rank; (3) the labor-intensity of the project, that is, the percentage of labor costs to total costs—30% of the basic rank; and (4) per capita income in the applicant's jurisdiction—15% of the basic rank. 13 C.F.R. § 316.10(a)(2)(i). After the basic rank was thus obtained, additional or bonus points were awarded to projects which (a) exhibited potential for long-range benefit; (b) were sponsored by a general purpose unit of government; or (c) related to existing approved community development plans. 13 C.F.R. § 316.

All project applications within each state and within the relevant "pot" (i. e. 70% or 30%) were then ranked in order of their scoring.[3] The unemployment figures and rates were adjusted by a logarithmic formula designed to equalize the positions of large and small communities, so as to enhance the prospects of smaller communities (with fewer absolute numbers of persons unemployed) receiving grants. When all the projects were ranked in final order, the Secretary made the final selection of programs to be funded in order of ranking. Certain projects in counties which had already received what was determined to be their fair share of the funds available for the state were "skipped" over and awards made to the next highest ranking project.

Applicants in New York were required to submit their applications to the Atlantic Regional Office of the Economic Development Administration (EDA) of the Depart-

ment of Commerce. The regional EDA office received more than 1,654 applications for financial assistance from the state or local governments in New York State; these applications were for the aggregate sum of $1,712,077,142. The New York State allocation of funds, the maximum permitted by law, was only $231,000,000. Affidavit of George T. Karras, *supra*, ¶ 13. Among the applications for assistance under the Act received by the EDA was the City of Newburgh's application for a grant of $3,516,478. for the "Renovation and Enlargement of the Washington Lake Filter Filtration Plant." Newburgh identified its "project area" as being that of "Orange and Ulster" counties. That designation was accepted by EDA and Newburgh's application evaluated on the basis of the 9.25% average unemployment rate for the two counties certified by New York State. Newburgh also received the maximum number of bonus points.

Newburgh's application was received by EDA on November 10, 1976. On January 6, 1977, Newburgh was advised in writing that its project would not be funded. Out of the 1,379 New York applications for grants which were accepted by EDA, Newburgh's application ranked 1,169. The lowest ranking project in the 70% pot to be selected for funding in New York State ranked 261; only 106 applications in the 70% category from New York State received grants.

## II.

▇ The government argues that since "[p]laintiffs are at the bottom of the list of projects in New York State[,] [t]he possibility that the Court will order sufficient amendments to the administration of the Act to move plaintiffs' application into the realm of possible funding is 'so tenuous as

---

**3.** The total planned allocation or "planning ceiling" for each State, was determined as follows:

"Subject to program administrative costs and statutory minimum and maximum amounts allocated to individual States by the legislation, 65 percent of the funds will be set aside as planning ceilings for individual States based on the share of unemployed workers residing in a State of the total national unemployed; 35 percent of the funds will be set aside as planning ceilings to individual States based on the relative severity of unemployment for each State above the national unemployment rate." 13 C.F.R. § 316.-8(b).

to approach the non-existent,' [*Evans v. Lynn*, 537 F.2d 571, 595 (2d Cir. 1976) (*en banc*), *cert. denied*, 429 U.S. 1066, 97 S.Ct. 797, 50 L.Ed.2d 784 (1977)]," and accordingly, that plaintiff lacks standing to challenge the Secretary's implementation of the LPWA. While the remoteness of the possibility that plaintiff will succeed in gaining for their own use a grant bears on the appropriateness of preliminary injunctive relief, we cannot agree that plaintiff's position on the list affects its standing to sue.

Plaintiff relies on no esoteric theory of standing. It is an applicant for federal funds, whose application was deemed eligible for funding under statutory criteria, and whose application was denied due to its rating on a scale devised by an administrative agency which plaintiff claims was improper. It is difficult to conjure a more "concrete and personalized injury" flowing directly from the governmental action challenged. The government's argument—in essence, that plaintiff cannot show "injury in fact"—confuses the jurisdictional requirement of 'standing' with the question on the merits of whether plaintiff is entitled to the relief sought. If it were agreed that recomputation of the entire New York State list in accordance with the methods which plaintiff argues are proper, would still not result in plaintiff receiving a grant, dismissal of the complaint or summary judgment for the defendants might be appropriate. Be that as it may, however, Newburgh claims that it might well receive a grant were certain factors rated differently, and the government has submitted no evidence to support its position that such a result is an impossibility. The burden surely cannot be placed on plaintiff to demonstrate the results of the massive recalculations that might follow should it succeed in all its claims on the merits simply to sustain its standing to litigate its challenges. Nor is it sensible to make standing to sue depend on whether a disappointed applicant is number 300 on a list or number 1,100. As the Supreme Court has repeatedly cautioned, "standing in no way depends on the merits of plaintiff's contention that particular conduct is illegal." *Warth v. Seldin*, 422

U.S. 490, 500, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975). Depending on the outcome on the merits, either number 300 or number 1,100 on the list has a sufficiently personal and concrete interest in remedying the injury which occurred, namely, rejection of its applications.

Neither *Evans v. Lynn, supra*, nor *Warth v. Seldin, supra*, support the government's position. Plaintiffs in *Evans* were minority residents of the inner-city protesting a HUD grant for a sewer project in a nearby suburban community, on the ground that HUD had failed in its statutory duty to consider the impact on racial housing patterns before awarding grants. Plaintiffs' relationship to the governmental action in question was tenuous at best: "[appellants] make no claim that they have ever sought or been refused housing. . . . They do not allege that either of the challenged projects will discriminate against them. They make no claim that the federal funds were diverted from any actual or proposed housing project that could have been of benefit to them. In short, they allege no specific, personal adverse result whatsoever from the grants for sewer and park construction." *Evans v. Lynn, supra*, 537 F.2d at 590.

Although in *Warth* plaintiffs did allege that a challenged zoning ordinance resulted in their being unable (as minority or low-income persons) to find adequate housing, the Court held that plaintiffs failed to allege a sufficiently specific connection between the zoning ordinance and their inability to afford housing in the locality. Where nonresidents challenge a local zoning ordinance as having an unconstitutional effect on their ability to find housing in the locality, it is obvious that there are numerous factors—some governmental, some private—at work to create the economic or social situation complained of. In the case at bar, by contrast, plaintiff applied to the defendants for funds and defendants denied plaintiff's application. It would be a mistake, under these circumstances, to permit the 'injury in fact' requirement to become a vehicle for converting the jurisdictional doctrine of

standing into a tool for *sub rosa* decision of the merits of a controversy. We find that plaintiff has alleged a direct injury—denial of a grant application—which gives it a sufficiently concrete and personalized stake in the outcome of this litigation to meet the requirements of Article III of the Constitution.

## III.

"The settled rule is that a preliminary injunction should issue only upon a clear showing of either (1) probable success on the merits *and* possible irreparable injury, *or* (2) sufficiently serious questions going to the merits to make them a fair ground for litigation *and* a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Sonesta Int'l Hotels Corp. v. Wellington Associates*, 483 F.2d 247, 250 (2d Cir. 1973). (emphasis in original) Accord, *Gulf & Western Indus. v. Great A. & P. Tea Co., Inc.*, 476 F.2d 687, 692–93 (2d Cir. 1973). For reasons elaborated below, plaintiff can demonstrate a probability of success on none of the issues raised. Moreover, even if plaintiff succeeds in establishing that certain regulations are improperly applied, it is most unlikely that plaintiff will ultimately prove itself to be entitled to a grant from the initial $2 billion appropriated for the LPWA, since it holds so low a position on the list of eligible applicants. Accordingly, the test to be applied is whether, in addition to raising serious issues going to the merits, plaintiff shows that the balance of hardships tips decisively in its favor.

### A. The Merits

■ At the outset it is appropriate to comment on the standard for review of the agency's actions here. When Congress directs an agency to administer a complex grant program for which eligible applications exceed available funding by 1,000% and to reach final decisions on all applications within sixty days, and does so in order to insure the expeditious expenditure of funds to fight unemployment and recession, the unavoidable conclusion is that Congress intended to accord the greatest of latitude to the agency's decisions. Decisions made under such time pressure are bound to appear less-than-perfect when viewed from the unhurried hindsight of judicial deliberations; yet by imposing so strict a timetable Congress necessarily determined that speedy action was more important than punctilious observance of its every command. Except in cases of grossest abuse, injunctive relief against expenditure of funds already allocated under the Act is inconsistent with Congress' intent speedily to place in circulation the appropriated funds. Thus, the agency's actions in promulgating rules and awarding grants must be sustained absent a showing of bad faith, bias or corruption in its administration or a showing that the Secretary's determinations are in direct violation of a statutory mandate or without any rational basis. Cf. *M. Steinthal & Co. v. Seamans*, 147 U.S. App.D.C. 221, 455 F.2d 1289, 1301 (1971).

### 1. Use of Local Unemployment Figures.

■ Plaintiff argues that in violation of § 108(c) the agency refused to allow local unemployment figures for the City of Newburgh to be used in its application and failed to provide assistance to Newburgh in developing such local figures. Both claims are based on an interpretation of the following statutory language:

"Information regarding unemployment rates may be furnished either by the Federal Government or by States or local governments, provided the Secretary determines that the unemployment rates furnished by States or local governments are accurate, and shall provide assistance to States or local governments in the calculation of such rates to insure validity and standardization."

The statutory language is alternative and discretionary; information "may" be furnished "either" from federal or local sources. At least one reasonable interpretation of this language is that the decision as to source of information is committed to the Secretary's limited discretion. The reasonableness of this interpretation is enhanced by the subordinate clause in the

above-quoted sentence, which conditions use of other-than federally provided figures on two decisions committed to the Secretary's discretion: that the local figures in question are accurate and that the Secretary assist the localities in developing the figures. Nonfederal figures were intended by Congress to be used *only* where the Secretary determined to assist the nonfederal source in developing its figures, and even then only when the Secretary determined that the local figures were accurate. In short, the requirement that the Secretary "shall provide" assistance to localities is activated *only* when the Secretary decides to accept nonfederal figures. Accordingly, plaintiff's claim that the Secretary improperly failed to provide it assistance is without merit, especially since plaintiff never requested federal assistance in developing its own unemployment figures.

It follows that the Secretary was not required to use locally-derived unemployment figures. Indeed, given the volume of applications and the sixty day deadline for choosing projects, it would have been impossible for the Secretary to provide sufficient assistance to the tens of thousands of localities across the country which submitted applications to insure their "validity and standardization."

■ For purposes of the LPWA, the Secretary did arrange for a general variance from OMB standards which would normally have required it to rely only on federal Bureau of Labor statistics[4] in order to permit applicants to submit statistics developed by State unemployment offices for proposed project areas for which federal statistics were not available. Newburgh could have designated itself as the project area and submitted the New York State unemployment rate figures for the City of Newburgh. It did not do so and cannot now be heard to complain on this subject.

Even if Newburgh were correct in its interpretation of the statute, however, and had requested and been denied assistance or permission to use its own figures, defendants have demonstrated that Newburgh suffered no harm from any failure to submit local figures. EDA recalculated Newburgh's position on the list using Newburgh itself as the project area, and using both the New York State unemployment rate figures for the City and the figure suggested by the City itself; Newburgh rated even lower on the list using its own unemployment rate, because by changing the "project area" designation it lost points on the factor of absolute numbers of persons unemployed.

For these reasons, plaintiff's claims on this point are without merit.

*2. Benchmarks, Logarithms, and the Labor Intensity Ratio.*

■ Plaintiff's barrage of challenges to various technical aspects of implementation of the Act are all without merit. Newburgh claims that the Secretary improperly implemented Congress' requirement that he consider the "extent to which the project will reduce unemployment" by requiring applicants to submit a "labor intensity ratio" which reflects the percentage of total project costs which will go directly to employing workers. It argues that the Secretary should consider instead the total number of workers to be employed. However, the government must make choices between competing applications, and it is certainly reasonable to evaluate the comparative ability of various projects to reduce unemployment by such a comparative ratio. There is no error in the Secretary's decision to use a labor-intensity ratio, nor in the decision to accept applications from projects with up to 80% labor costs.[5]

---

4. The parties refer to these statistics as "CETA" figures, which were developed for use in connection with the Comprehensive Employment & Training Act of 1973, 29 U.S.C. § 801 *et seq.*

5. Section 316.10(a)(6)(C) of the regulations provides in part that:

"To implement the legislative objective of assisting the construction and construction-related industries: (1) projects having labor costs greater than 35 percent of total project costs, but not more than 80 percent, will receive the maximum score for this factor; and (2) projects having labor costs ranging

Plaintiff's challenge to the Secretary's use of a logarithmic formula to improve the ranking of applications submitted by smaller communities (which score lower on an unadjusted "basic rank" than do larger communities with higher absolute numbers of persons unemployed) is incomprehensible. Not only is such a formula consistent with the Congressional directive that the Secretary consider the needs of different geographic sections of the country, but it can only benefit a relatively smaller community such as Newburgh and its proposed project area.

■ Similarly, the objection to the "benchmark" system is difficult to understand. Projects low on the list stand only to benefit from use of the "benchmarks;" if any disappointed applicant were likely to succeed on a claim that it was injured by use of the benchmarks it would be one of the applicants who was actually skipped over because its county had already received its due. Plaintiff is in no such position (it being from a county which had no grants and 1,169 on a list the lowest number of which was reached was 263) and would accordingly not be entitled to relief on this claim even if it otherwise had merit. Moreover, the benchmark system is an appropriate exercise of discretion designed to implement congressional intent to assure a fair geographic distribution of funds.

### 3. How the "Pots" Are Filled.

■ Plaintiff argues that the Secretary improperly decided in 13 C.F.R. § 316.-10(a)(3) to allocate funds within each state in accordance with the 70%–30% breakdown required by Congress to be applied to the overall allocation of grants, and further claims that the Secretary has improperly awarded grants within the 30% group. Since plaintiff fell within the 70% group and does not maintain that it should have been classified as having below average un-

employment rates, however, it lacks standing to challenge the Secretary's allocation of funds within the 30% group.

■ The essence of plaintiff's argument on the per-state application of the 70–30% pots is that states with high levels of unemployment above the national average are nonetheless required to receive 30% of their allocation in grants to localities with below average unemployment, whereas states with relatively low unemployment rates are nonetheless using up funds in the 70% pot which could better be spent in states with higher unemployment. The difficulty with the argument is that by establishing the 30% pot and requiring the Secretary to allocate funds in that pot to localities or states with less than the national unemployment rate, Congress made the initial decision not to expend all appropriated funds on areas most needy in terms of their unemployment rate. Plaintiff has pointed to nothing in the Act which requires the Secretary to do other than what was done,[6] and we cannot conclude that the Secretary's decision to allocate funds within each state in accordance with the 70–30% breakdown was without rational basis.

### 4. Use of "SMSA" Statistics.

■ In its amended complaint, plaintiff argues that the Secretary improperly failed to advise the public that applicants were permitted to designate as their "project area" a Standard Metropolitan Statistical Area (SMSA) and that had plaintiff been aware of the acceptability of an SMSA project, it would have designated its project area to include the New York City SMSA, the northernmost county of which adjoins Orange County. SMSAs are designated by the Bureau of Labor Statistics for census purposes unrelated to the LPWA; an SMSA represents an area sharing a common labor force and economic market. Plaintiff's claim that the Secretary "secret-

---

from 10 to 35 percent of total project costs will be ranked according to their respective percentages, with projects having 35 percent receiving the maximum score for this factor."

**6.** Plaintiff has made no constitutional objection to the Act.

ly permitted . . . [l]ocal governments within the New York metropolitan area" to use SMSA statistics and that it was thereby prejudiced is wholly without merit.

First, there is no evidence that the possibility of using SMSAs as project areas was kept secret. The existence of the statistical classification of SMSAs has long been a matter of public record. Moreover, under the clear language of § 316.9(c), which provides that "If requested by an applicant, in determining the unemployment rate of a local government, unemployment in those adjoining areas from which the labor force for a project may be drawn shall be taken into consideration," any applicant with knowledge (which was public) of the existence of SMSAs could have, as many did, applied to the Secretary for permission to use the SMSA statistics for its project proposal. Newburgh did not seek to do so; rather, it designated Orange-Ulster County as its proposed project area, used the unemployment figures for that area, and indeed, has also complained that it was not permitted to use figures for Newburgh alone. It is clear that Newburgh was in no way prejudiced by illegal or abusive action of the Secretary but if prejudiced at all, only by its own ignorance or poor judgment.

Moreover, assuming arguendo that Newburgh's lack of knowledge were fairly attributable to the Secretary, the government has filed affidavits establishing that even if Newburgh had sought to identify its project area as including the entire New York City SMSA, such a designation would not have been accepted because:

"a. The New York metropolitan area as a source of unemployment statistics would be inappropriately large for Plaintiff's project;

b. The number of unemployed as reported by Plaintiff in its project area was sufficiently large for the project; and

c. The Orange County-Newburgh Area is classed as a small labor area (Directory of Important Labor Areas) by the Manpower Administration of the United States Department of Labor."

Affidavit of John J. Curran, Chief, Planning Division Atlantic Regional Office, Economic Development Administration.

We have no reason to doubt the validity of the argument and accordingly see no basis for granting preliminary injunctive relief on this aspect of the complaint.

■■ Newburgh next contends that by permitting applicants to choose between designating project areas and unemployment rates on the basis of various adjoining areas, the Secretary undermined the validity of the comparisons which are made between competing applications. It is surely unfortunate that allocation of scarce federal assistance funds for needed public works projects may sometimes depend on the "grantsmanship" of the applicants. Congress itself, however, provided that applicants could, within their own discretion, seek to designate their projects to include adjoining areas. LPWA § 108(f). The Secretary has followed Congressional mandates in this area by permitting some applicants to rely on unemployment figures for an entire SMSA, since SMSA's represent unified labor forces. Although § 108(e) and (f) of the Act, and Secretarial practices and regulations pursuant thereto, may enhance the importance of "grantsmanship" skill in applying for these funds, this factor alone does not demonstrate such irrationality or abuse as to warrant preliminary injunctive relief pending further consideration of the question.

### 5. Failure to Give Reasons.

■■■ Plaintiff argues that the agency is in violation of § 316.14(b) which provides that "The Regional Director shall notify the applicant, in writing, when its application has been rejected and state the reasons therefor." The government answers that the regulation applies only to "rejections" of applications as being in improper form or otherwise ineligible, and does not apply to "denials" of eligible applications for lack of funds. Its position is supported by the remaining subparagraphs of § 316.14, which provide that the Regional Director should·

forward all eligible applications to Washington for final decision, and by § 316.10(b) which provides that an application "shall be rejected" for defects in form. Newburgh's application, however, was found to be proper and eligible and was "accepted," though ultimately denied. Although plaintiff's construction is not unreasonable, an agency's interpretation of its own regulations is entitled to substantial judicial deference, *Udall v. Tallman*, 380 U.S. 1, 16–17, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965), if rational, as is the interpretation at hand. Further, this aspect of the controversy has essentially been mooted by the full explanation which the Regional Office of EDA has provided plaintiffs for denial of their application during the course of this litigation. Accordingly, plaintiff has shown no probability of success or serious question meriting further deliberation on this issue.

6. *Exclusive Reliance on 3 Months' Unemployment Figures; Failure to Consider Underemployment or Conditions in Construction Industry.*

■ Plaintiff argues that in violation of § 107's requirement that the Secretary measure the "severity *and* duration" (emphasis added) of unemployment in proposed project areas the regulations only permit consideration of figures for the most recent three months for which data is available. 13 C.F.R. § 316.10(a)(2)(i)(B). The Act does not require the Secretary to consider any specified time period in measuring duration, although § 108(c) requires that data for the three most recent consecutive months available be used to determine whether the applicant falls into the 70% or the 30% pot. Of course, a reasonable argument can be made that a realistic measure of the duration of unemployment should exceed a three-month period, and that Congress intended that relative duration of severe unemployment be considered in deciding between otherwise equivalent competing projects. However, in light of the limited standard of judicial review of the agency's actions in implementing this statute, it cannot be said plaintiff has shown a probability of success in its contention that three

months is simply too short; yet the issue remains serious.

Similarly, plaintiff's challenge to the Secretary's failure separately to consider underemployment in the proposed project areas, and specifically, underemployment and unemployment in construction industries raises important questions going to the merits. The government's first justification for its conceded failure to evaluate data as to these factors, that there was simply so much unemployment to deal with that there were neither resources nor time to deal with underemployment, is not persuasive. The Act imposes a mandatory duty on the Secretary to consider these factors. LPWA § 107. Moreover, it is difficult to understand how much more burdensome the process of decision would have been had three additional items of data been sought on the application forms provided.

The second rationale offered in support of the agency's position is that:

"An area characterized as having a high unemployment rate overall is generally characterized as having a high unemployment rate in the construction industry. Similarly, an area characterized as having a large number of unemployed overall is generally characterized as having a relatively large number of unemployed construction workers as a share of the overall unemployed. Therefore, this factor gives consideration to construction unemployment. [number of unemployed workers in the project area averaged over the three last months] 13 C.F.R. § 316.-10(A)(2)(i)(A)

and that per capita income levels reflect to a sufficient degree underemployment problems. Decisions of this sort are ordinarily properly left to agency discretion and expertise. The Secretary's rationale at the very least is an arguable rational basis under the statute for the agency's failure to consider data in each of the categories specified by Congress. At the preliminary state of pleading, however, it is impossible to rule finally on the propriety of agency action in this regard. Nevertheless, we find that

plaintiff has raised a serious issue going to the merits worthy of further deliberation.

In sum, we find that plaintiff has failed to show any probability of success on those of its claims on which it bases its prayer for injunctive relief, but that two of the objections discussed in (6) above raise serious questions going to the merits.

### B. Balance of Hardships

It remains to be determined whether the injury which Newburgh would suffer if injunctive relief is not afforded decisively outweighs the injury to the government, and the general public, if the injunction is issued. Newburgh has made a substantial showing of its own financial distress and of the importance to its continued vitality and the welfare of its citizens of immediate construction of the water filtration plant for which it sought LPWA funding. However, its interest must be weighed against Congress' intent speedily to put unemployed persons throughout the country to work on public works projects. While the funds at issue are subject to an injunction, they cannot be used by any locality or state to put any unemployed persons to work. Congressional intent with respect to these funds has already been thwarted for several months, and preliminary injunctive relief would keep these funds out of the hands of unemployed persons in other deserving communities in New York State for even longer.

It is impossible under these circumstances to find that the balance of hardships tips decisively in plaintiff's favor. "Courts of equity may go much further to give or withhold relief in furtherance of the public interest than where only private interests are involved." *Brown & Williamson Tobacco Corp. v. Engman*, 527 F.2d 1115, 1121 (2d Cir. 1975), *cert. denied*, 426 U.S. 911, 96 S.Ct. 2237, 48 L.Ed.2d 837 (1976). Even where an agency's actions are found to be wholly without rational basis—which it cannot be claimed is the case here—"there is room for interjecting sound judicial discretion in the presence of overriding public interests and to refuse injunctive or declaratory relief." *M. Steinthal v. Seamans, supra*, 455 F.2d at 1301. The public interest is greatly involved in this case, and the national public interest here is to see that the funds are spent quickly on employing the unemployed.[7]

Our finding that the equities favor the government is supported by the recent extension of funding and amendment of the Act effective May 13, 1977. By Pub. L. No. 95–28 (H.11) Congress increased the authorization for funding of projects under the LPWA to $6 billion and appropriated an additional $4 billion which is to be used solely to fund projects, such as Newburgh's, previously found to be eligible for assistance under the Act but for which funds were unavailable. In addition, the selection criteria were amended in various ways. The availability of these additional funds to applicants in plaintiff's position suggests that the injury alleged by plaintiff may not be irreparable and supports the finding that plaintiff has failed to make a showing sufficient to warrant enjoining expenditures of already allocated funds in the initial Congressional appropriation.

For the foregoing reasons, the motion for a preliminary injunction is denied.

It is so ordered.

---

7. This suit is one of several brought by disappointed applicants for funds under the LPWA. The government advises us that in all such cases, preliminary injunctive relief has been denied. See, e. g., *City of Benton Harbor v. Richardson*, 429 F.Supp. 1096 (D.C.Mich.1977); *City of Grand Rapids v. Richardson*, 429 F.Supp. 1087 (D.C.Mich.1977); *Edward F. Clark, et al., v. Richardson*, 431 F.Supp. 105 No. 76–2460 (D.N.J.1977); *Joram v. Richardson*, No. 77 Civ. 339 (S.D.N.Y.1977).